GROVE FRESH DISTRIBUTORS, INCORPORATED, Plaintiff-Appellee,

v.

NEW ENGLAND APPLE PRODUCTS COMPANY, INCORPORATED, Defendant–Appellant.

No. 91–3226.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1992.

Decided Aug. 4, 1992.

Rehearing and Rehearing En Banc Denied Sept. 22, 1992.

John P. Messina, Dorothy B. Zimbrakos, Dale R. Crider, Warren S. Radler (argued), Rivkin, Radler, Bayh, Hart & Kremer, Robert A. Langendorf, Chicago, Ill., for plaintiff-appellant.

Mitchell H. Frazen, Burditt & Radzius, Chicago, Ill., Robert L. Ciociola (argued), Casner & Edwards, Boston, Mass., for defendant-appellant.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

This case is about the marketing of orange juice from concentrate packed in ten-ounce, single-serve glass bottles. Grove Fresh Distributors, Incorporated ("Grove Fresh") brought a suit in federal district court against New England Apple Products Company, Incorporated ("New England Apple") based in part on the Lanham Act. Grove Fresh claimed that although the product labels on New England Apple's juice carry the Florida Seal of Approval and state that the product is "100% Florida," the juice was adulterated with sugar and "pulpwash."[1] Grove Fresh also con-

---

1. "Pulpwash" is the liquid left over after water is forced through "finisher pulp" (the skin, the peel, pulp and some juice solids which remain after the juice is squeezed from the oranges during processing). The official name for pulpwash is "water extractable soluble orange sol-

tended it was injured by New England Apple's acts. Grove Fresh prevailed at trial on its Lanham Act claim, and the jury awarded Grove Fresh $100,000 of New England Apple's profits. New England Apple timely filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The trial court denied this motion. New England Apple appeals the final judgment entered against it, raising two issues. The first is whether Grove Fresh demonstrated by admissible evidence a causal link between New England Apple's false advertising and Grove Fresh's loss of business. New England Apple contends that if Grove Fresh did not offer admissible evidence to prove this point the trial court erred in not directing a verdict in New England Apple's favor and in denying to enter in New England Apple's favor judgment notwithstanding the verdict. The second issue is whether the trial court properly allowed Betsy Woodward, Chief of the Bureau of Food Laboratory of the Florida Department of Agriculture and Consumer Services, to testify as a rebuttal witness. New England Apple claims Betsy Woodward was an undisclosed expert witness in violation of local rules, that her testimony was rehabilitative rather than rebuttal, and that her testimony substantially prejudiced New England Apple resulting in an unfair trial. For the following reasons, we affirm.

## FACTUAL BACKGROUND

Grove Fresh is a distributor of a variety of brands of fruit juices, drinks and food products such as salads, cole slaws and cereals. Grove Fresh's primary market is the south and west sides of the city of Chicago, Illinois. Orange juice, sold primarily in ten-ounce, glass bottles, is the most significant of Grove Fresh's products. Grove Fresh competes in the market of ten-ounce, single-serve bottles of orange juice against several manufacturers. One of these manufacturers is New England Apple. New England Apple is a closely-held Massachusetts corporation. New England Apple's only products are its "Veryfine" brand fruit juices and drinks. New England Apple is the leading seller in the ten-ounce, glass-bottle drink market. As to this particular case, the parties have stipulated that the relevant market they competed in was 100% pure orange juice from concentrate packed in ten-ounce, glass bottles and sold in the metropolitan Chicago area between 1983 and 1988.

Grove Fresh and New England Apple distributed their orange juice in different ways. Grove Fresh bought its juices from packers in cases, usually packed with twenty-four bottles per case. Grove Fresh then sold the cases of orange juice to route drivers. The price at which Grove Fresh sold cases of orange juice to its route drivers reflected a profit for the company. The route drivers then sold cases of juice to retailer-customers. The price at which the route drivers sold to retailers included a profit for themselves. In contrast, New England Apple produced and packed its own juice. Prior to 1986, New England Apple relied on jobbers and wholesalers to service the Chicago market. Beginning in 1986, New England Apple began using its own sales force to sell to distributors. The distributors then sold New England Apple's juice to retailers. Both Grove Fresh and New England Apple enjoyed significant sales of their juices through 1987.

However, when Grove Fresh suffered a decline in sales of its juice subsequent to New England Apple's entrance into the Chicago market, Cecil Troy, the president of Grove Fresh, gathered samples of his competitors' juice and sent them to Dr. Allan Brause, an analytical food chemist recommended by an agent of the Food and Drug Administration, to be tested for adulteration. Cecil Troy was losing customers, according to his route drivers, because his competitors were underpricing Grove Fresh. It was Troy's theory that his competitors could not achieve prices lower than his unless they were selling adulterated juice. That is, 100% from concentrate ori-

ids." It has a bitter taste due to extractive from orange peel. Although federal regulations permit the addition of some pulpwash to the origi-

nally squeezed juice, a juice labelled with both the Florida Seal of Approval and "100% Florida" may contain no pulpwash.

ange juice could not be produced and sold at a reasonable profit for prices less than those Grove Fresh sold to its customers unless the 100% orange juice concentrate was diluted with cheaper products.

Dr. Brause tested the samples Troy sent to him. Dr. Brause performed several tests on five samples of New England Apple's Veryfine orange juice. Dr. Brause concluded that all five samples were adulterated. Dr. Brause concluded the samples were adulterated for several reasons. First, to be labelled "100% orange juice from concentrate" a juice must contain essentially orange juice and water. The Federal Food and Drug regulations at 21 C.F.R. § 146.145, specify there should be a minimum level of 11.8 Brix in any orange juice labelled "100% orange juice from concentrate." 11.8 Brix represents the percentage by weight of orange juice solids if 100 grams of freshly squeezed orange juice is heated so that when all of the water evaporates the resulting solids (including sugar, proteins, minerals and other compounds that naturally occur in orange juice) would weigh 11.8 grams. Both Dr. Brause, Grove Fresh's expert, and Dana Krueger, New England Apple's expert, tested several samples of New England Apple's juice. Each expert concluded several samples of the juice did not meet the minimum 11.8 Brix standard.

Second, Dr. Brause tested samples of New England Apple's juice using the "Petrus Method," which is the Association of Analytical Chemists ("AOAC") official test for pulpwash. Florida regulations prohibit the addition of pulpwash to orange juice labelled with the Florida Seal of Approval or with the designation "100% Florida." New England Apple's Veryfine juice bottles carried both the seal and designation. Dr. Brause concluded all five samples of New England Apple's juice Mr. Troy sent to him contained pulpwash. New England Apple contends Dr. Brause did not follow exactly the Petrus Method in testing the samples and because of this failure Dr. Brause's test results are subject to doubt. However, New England Apple's expert also performed tests on over 100 samples of New England Apple's juice, discovering ev-

idence of pulpwash in many of the samples. In May of 1989, after testing approximately 100 samples of New England Apple's juice, Dana Krueger initially reached the conclusion that New England Apple systematically adulterated its juice with pulpwash.

Finally, Dr. Brause performed several other tests for detection of pulpwash, added sugar and trace metals. Dr. Brause concluded from these tests that all five samples of Veryfine juice sent to him by Mr. Troy contained pulpwash and three samples contained added beet sugar. The presence of pulpwash and added beet sugar in juice is not permitted in juice labelled "100% Florida" and carrying the Florida Seal of Approval. Dr. Brause testified that New England Apple pervasively adulterated its orange juice from 1983 to 1989. His opinion was based on tests he performed; two adulteration tests of Veryfine juice in 1983 and 1985 run by Donald Petrus, the inventor of the Petrus Method, finding both samples adulterated with pulpwash; and nineteen quality tests run from 1986 to 1989 under Donald Petrus's supervision indicating that all samples of Veryfine juice failed the minimum flavor standards required by regulations for the Florida Seal of Approval. Dr. Brause's conclusions formed the primary basis for Grove Fresh's suit against New England Apple.

The case was tried to a jury from May 6, 1991, to May 23, 1991. The jury found in favor of Grove Fresh on its Lanham Act claim and awarded Grove Fresh $100,000 of New England Apple's profits. After trial both parties filed motions. Grove Fresh filed a motion to alter or amend the judgment and a motion for judgment notwithstanding the verdict on its state law claim. New England Apple filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The trial court denied both parties' motions. New England Apple timely filed a notice of appeal to this court. Grove Fresh filed no cross appeal.

## ANALYSIS

New England Apple claims the jury's award of damages to Grove Fresh is not

supported by any admissible evidence. New England Apple explains it was Grove Fresh's burden to prove not only that New England Apple adulterated its juice contrary to its label and that Grove Fresh lost business but also that there was a link between the two. That is, Grove Fresh was required to show that New England Apple's adulteration caused in some way Grove Fresh's loss of business. *See Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir.1985) (stating, "the plaintiff may not recover if he fails to prove the defendant's actions caused the claimed harm"). New England Apple claims that Grove Fresh sought to meet this burden by asserting two propositions. First, Grove Fresh lost orange juice sales to New England Apple because New England Apple offered Grove Fresh's customers a lower price than Grove Fresh for the juice. And second, New England Apple was able to charge such low prices only by adulterating its juice with cheap ingredients like pulpwash. New England Apple contends that evidence of underpricing, then, was essential to Grove Fresh's case, but the only evidence of underpricing Grove Fresh offered was inadmissible. New England Apple concludes that Grove Fresh thus failed to make a prima facie Lanham Act claim.

■ The evidence that is the subject of this appeal is the testimony of Grove Fresh's president, Cecil Troy, and three of Grove Fresh's route drivers. These witnesses testified to statements made to them by former customers of Grove Fresh. Essentially the testimony is that the customers switched to Veryfine juice because it was cheaper. The district court admitted the statements for the fact that the customers made the statements, not for the truth of statements. Additionally the trial court accepted the statements for the purpose of showing the customers' state of mind. New England Apple, however, argues on appeal that the customers' statements regarding underpricing does not fall within the state of mind exception to the hearsay rule and that Grove Fresh's only purpose for offering the statements was

for the fact of underpricing which is improper.

We agree with New England Apple that Grove Fresh cannot offer the customer statements to prove the fact of New England Apple's underpricing. At best, the statements establish that the customers switched from Grove Fresh juice to Veryfine juice. The trial court made this point at trial remarking, "Whether it was a true reason or a false reason doesn't make any difference, it is what they told him, and in that context it is not hearsay, it is like a complaint."

If the statements are considered under the exception to the hearsay rule found at Fed.R.Evid. 803(3), which reads in part: "**Then existing mental, emotional or physical condition.** A statement of the declarant's then existing state of mind ... (such as intent, plan, motive, design, ...) but not including a statement of memory or belief to prove the fact remembered or believed ...," the statements still cannot be offered to prove New England Apple in fact underpriced Grove Fresh. The statements are admissible only for showing a customer's motives for no longer dealing with a supplier. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 914 (2nd Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). New England Apple points out that Rule 803(3) allows in hearsay evidence only if the customer's state of mind is relevant. Grove Fresh counters that the customers' reasons for buying Veryfine juice instead of Grove Fresh's juice is indeed relevant because Grove Fresh's complaint is that customers switched to Veryfine *believing* they were getting a product as good as (or better than) Grove Fresh's product at a lower price.

We also think Grove Fresh's former customers' reasons for switching from Grove Fresh juice to Veryfine is very relevant to this case. But, we do not think, as Grove Fresh does, that the customers' statements that they switched to Veryfine because Veryfine was cheaper necessarily means that the customers switched due to New England Apple's false advertising. Regard-

less, even if we agree with New England Apple that the customer statements should not have been considered, Grove Fresh still produced enough evidence at trial to support its Lanham Act claim. In short, we think the customer statements regarding New England Apple's alleged underpricing were incidental to Grove Fresh's Lanham Act claim.

■ The trial judge instructed the jury, in accordance with *Skil Corporation v. Rockwell International Corporation*, 375 F.Supp. 777, 783 (N.D.Ill.1974), that Grove Fresh had to prove the following elements by a preponderance of the evidence in order to prevail against New England Apple:

(1) That New England Apple either falsely designated the origin, sponsorship, or approval of its product, or made a false or misleading representation of fact concerning the nature, characteristics, or qualities of its product;

(2) That New England Apple's actions deceived or had a tendency to deceive a substantial portion of the audience;

(3) That New England Apple's actions influenced a purchasing decision;

(4) That the advertised or promoted products moved in interstate commerce; and

(5) That as a result of New England Apple's actions, Grove Fresh has been injured—either by (1) a direct diversion of sales from its own products, (2) a loss of goodwill or reputation, or (3) a lessening of the acceptability that its products enjoy with the buying public.

Under these instructions, Grove Fresh did not have to prove New England Apple underpriced its products in order to prevail on its Lanham Act claim. Grove Fresh merely needed to prove that New England Apple falsely advertised its orange juice and that Grove Fresh lost customers because the customers thought they were buying the same or a better juice than they actually bought. So the question is, what evidence did Grove Fresh produce, besides the customer statements indicating that its customers switched due to Veryfine's lower prices, that demonstrated a reason for Grove Fresh's diversion of business?

The jury could infer from the scientific evidence presented that Veryfine juice was falsely advertised since Veryfine juice was labelled "100% Florida" and carried the Florida Seal of Approval despite that the juice did not comply with the requisite Florida regulations to be labelled as it was. Furthermore, Grove Fresh clearly established its injury, that it lost customers to New England Apple. Finally, there was testimony at trial linking Grove Fresh's injury with New England Apple's false advertising. Specifically, Kristen Chadwell, General Counsel for the Florida Department of Citrus, testified to the importance of a "100% Florida" label and the Florida Seal of Approval. She explained that customers rely on these marks in making purchasing decisions. Edward Morgan, a route driver for Grove Fresh, testified that the Florida Seal of Approval was especially important to customers on the south and west sides of Chicago because these customers believe they are likely to receive inferior products as a consequence of where they live. And, Samuel Rowse, President of New England Apple, testified his company used the Florida Seal of Approval because the approval is an indication of a better quality product. From this evidence the jury could infer that Grove Fresh's customers saw a label on Veryfine juice that was false because it stated the juice was "100% Florida" and carried the Florida Seal of Approval when the juice did not meet the requisite standards to be so labelled. The jury could also infer that the customers switched to Veryfine juice based in part on the false labelling, even if their decision was also based in part on the fact that the customers believed Veryfine was cheaper.

Although one avenue Grove Fresh utilized at trial to establish New England Apple's adulteration of its juice was through evidence of New England Apple's lower prices (so that the jury could infer that the only way New England Apple could achieve such low prices was by adulterating its orange juice concentrate with cheaper ingredients), this evidence was not the only evidence of adulteration at trial.

Similarly, Grove Fresh did not need to establish New England Apple charged lower prices to show that it lost customers to New England Apple. Therefore, New England Apple's assertion that "without evidence that Grove Fresh's customers switched to New England Apple's juice because of its lower price, Grove Fresh could not meet its burden of proving its loss of business to New England Apple was caused by the alleged adulteration" is not supported by the evidence in the record. Grove Fresh simply did not need the customers' statements to be admitted for the truth of the fact that New England Apple charged lower prices than Grove Fresh, nor did Grove Fresh need to establish that the customers switched because they believed New England Apple's juice was cheaper in order to prevail on their Lanham Act claim. Grove Fresh could have used the statements to establish only that the customers switched to Veryfine juice. And when that evidence is considered in light of the rest of the evidence Grove Fresh produced at trial, which establishes a nexus between New England Apple's false labelling and the diversion of Grove Fresh's business to New England Apple, we believe Grove Fresh produced sufficient admissible evidence to support the jury's verdict.

■■ Thus, we think the trial court's denial of New England Apple's motion for judgment notwithstanding the verdict or in the alternative for new trial was proper because the court's admission of the customer statements was not improper. In reviewing a motion for JNOV we look to the evidence presented and determine *de novo* whether this evidence combined with all reasonable inferences permissibly drawn from the evidence is sufficient to support the jury's verdict when viewed in a light most favorable to the party against whom the motion is directed. *See Taylor v. National Railroad Passenger Corp.*, 920 F.2d 1372, 1376 (7th Cir.1990). In respect to New England Apple's alternative motion for a new trial we look to see "whether the verdict is against the weight of the evidence, the damages were excessive, or that, for other reasons, the trial was not fair to the party moving." *Id.*

(quoting *Fleming v. County of Kane, State of Illinois*, 898 F.2d 553, 559 (7th Cir.1990)). We will not usually reverse a trial court's denial of a motion for a new trial unless there is a clear showing of abuse of discretion. *Id.* We find that under these standards the trial court properly denied New England Apple's motions.

■ The second issue on appeal is whether the trial court properly allowed Betsy Woodward, Chief of the Bureau of Food Laboratory of the Florida Department of Agriculture and Consumer Services, to testify as a rebuttal witness. Grove Fresh requested permission to substitute Betsy Woodward as a witness in Donald Petrus's stead. Donald Petrus, the inventor of the Petrus test, was identified as a fact witness in the final pretrial order. The proper administration of the Petrus test, as well as the test's reliability, was a contested issue at trial. Grove Fresh offered Ms. Woodward not as an expert witness opining about whether New England Apple adulterated its juice but as a neutral fact witness on behalf of the state of Florida who would testify based on her personal experience as to the procedures and methods used, including the Petrus test, to test the New England Apple's juice in this case. New England Apple contends Ms. Woodward should not have been allowed to testify because her testimony was not rebuttal; rather, it was expert testimony rehabilitative of Dr. Brause's expert testimony in Grove Fresh's direct case. New England Apple points to Local Rule 5.00 note 7 that provides:

> Each party shall indicate which witnesses *will* be called in the absence of reasonable notice to opposing counsel to the contrary, and which *may* be called as a possibility only. No witness who is not listed [in the final pretrial order] will be allowed to testify except for good cause shown, except that each party reserves the right to call such rebuttal witnesses (who are not presently identifiable) as may be necessary, without prior notice to the opposing party.

New England Apple contends this local rule supports its argument that Grove Fresh has failed to show good cause why

Ms. Woodward should have been allowed to testify, especially when Dr. Brause was available to testify in true rebuttal. More than all this, New England Apple says Ms. Woodward's testimony rehabilitated Grove Fresh's expert's testimony with the cloak of a Florida official, which was unfairly prejudicial and requires reversal.

First, we examine the trial court's classification of Betsy Woodward as a rebuttal witness. New England Apple argues that Ms. Woodward cannot possibly be considered a rebuttal witness, claiming a fundamental requisite of rebuttal is that the offered evidence must rebut something injected into the record during the presentation of the defendant's case. Grove Fresh counters that Ms. Woodward's testimony was rebuttal, so Rule 5.00 did not require Grove Fresh to list Ms. Woodward in the final pretrial order. Grove Fresh supports its assertion with two reasons. First, it reasons that Betsy Woodward was not presently identifiable as a witness because Grove Fresh had originally listed Donald Petrus to testify on the subjects to which Betsy Woodward testified at trial. Donald Petrus, however, was unavailable by the time of trial. Second, Grove Fresh reasons that it did not anticipate certain factual issues New England Apple raised in its case in chief and Grove Fresh was entitled to meet these issues with rebuttal evidence.

The trial court looked to the four factors set out in *Spray–Rite Service Corporation v. Monsanto Company,* 684 F.2d 1226 (7th Cir.1982), in ruling on Grove Fresh's motion to call Betsy Woodward, who was not included on a pretrial witness list, to give rebuttal testimony. The four factors are:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified;

(2) the ability of that party to cure the prejudice;

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court;

(4) bad faith or willfulness in failing to comply with the court's order.

*Spray–Rite,* 684 F.2d at 1245 (citing *Meyers v. Pennypack Woods Home Ownership*

*Ass'n,* 559 F.2d 894, 904 (3d Cir.1977); *De Marines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1202 (3d Cir.1978)). The trial court found that New England Apple was not surprised by Ms. Woodward's testimony, having in its possession an affidavit of Ms. Woodward's submitted with Grove Fresh's memorandum in opposition to New England Apple's motion for summary judgment. The trial court also noted that Grove Fresh had initially listed Donald Petrus as a fact witness in the pretrial order, but by the time of trial Donald Petrus was no longer available to testify. Ms. Woodward testified in his stead, and the trial court concluded that she did not testify to any more than Mr. Petrus would have testified. The trial court decided that on these bases New England Apple's right to a fair trial was not prejudiced.

New England Apple says that Grove Fresh's justification for calling Ms. Woodward as a "substitute" for the fact witness Donald Petrus simply does not comport with this court's required showing of "manifest injustice" before a modification of a pretrial order is allowed. New England Apple cites *Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 587–88 (7th Cir.1989). In *Louis Vuitton,* however, the court was referring to a modification of a stipulation in a pretrial order, not the addition of a witness. In this case the trial court properly focused on whether New England Apple would be surprised and prejudiced if the court allowed Ms. Woodward to testify, and our review of the trial court's decision is whether that decision was an abuse of discretion. We think the trial court correctly followed *Spray–Rite* in determining that Ms. Woodward was a proper rebuttal witness. We therefore do not think Ms. Woodward was required to be listed as a witness in the final pretrial order.

Moreover, we do not believe New England Apple was unfairly prejudiced by Ms. Woodward's testimony. Although the trial court noted Ms. Woodward was qualified to testify as an expert, our reading of the record in this trial indicates that the trial judge carefully limited Ms. Woodward's testimony to rebuttal topics. The judge specifically cautioned Grove Fresh's

counsel on several occasions about asking Ms. Woodward whether Dr. Brause's or Mr. Krueger's testimony on certain topics was correct rather than asking proper questions concerning Ms. Woodward's personal knowledge of the correct testing procedures of orange juice. In light of the trial court's deliberate control of Ms. Woodward's testimony, we do not believe its admission constitutes reversible error.[2]

## CONCLUSION

For the foregoing reasons, we affirm the jury's award of damages in the amount of $100,000 to Grove Fresh, and we also affirm the trial court's denial of New England Apple's motion for judgment notwithstanding the verdict or in the alternative for new trial.

AFFIRMED.

**2.** We note finally the recent Illinois Appellate Court case of *Ronald Marshall v. Taylor–Wharton Co., a division of Harsco Corp.,* No. 1–90–0210, 1992 WL 152256 (June 30, 1992 Ill.App. Ct.). In *Marshall* the Illinois Appellate Court held that litigants confronted with last-minute expert witness substitutions must be given at least sixty days between the close of discovery and the opening of trial to prepare their case. The court stated Illinois Supreme Court Rule 220(b) "mandates" the sixty-day protection. And in *Marshall,* the court reversed the jury's $8.2 million verdict in favor of the plaintiff and remanded for a new trial. Even though the Illinois Supreme Court Rule did not apply to this case, which was tried in federal district court, we note the policy behind the rule comports with the trial judge's evaluation in the instant case of whether New England Apple suffered any prejudice by Grove Fresh's substitution of Ms. Woodward for Donald Petrus. The trial court properly looked to whether New England Apple was unfairly surprised by Ms. Woodward's testimony. Moreover, Ms. Woodward testified as a fact witness, not an as an expert whose testimony and background it may

be more necessary to more fully explore in preparation for trial.

