# United States Court of Appeals for the Federal Circuit

04-1387

AIR TURBINE TECHNOLOGY, INC.,

Plaintiff-Appellant,

v.

ATLAS COPCO AB, ATLAS COPCO TOOLS AB,
ATLAS COPCO NORTH AMERICA, INC., and
ATLAS COPCO TOOLS, INC.,

Defendants-Appellees.

Richard L. Horn, Akerman Senterfitt, of West Palm Beach, Florida, argued for plaintiff-appellant. With him on the brief was Philip M. Burlington, of West Palm Beach, Florida.

William P. Atkins, Pillsbury Winthrop LLP, of McLean, Virginia, argued for defendants-appellees. With him on the brief were Scott J. Pivnick, Guillermo E. Baeza, and Benjamin L. Kiersz.

Appealed from: United States District Court for the Southern District of Florida

Judge Kenneth A. Marra

# United States Court of Appeals for the Federal Circuit

04-1387

AIR TURBINE TECHNOLOGY, INC.,

Plaintiff-Appellant,

v.

ATLAS COPCO AB, ATLAS COPCO TOOLS AB,
ATLAS COPCO NORTH AMERICA, INC., and
ATLAS COPCO TOOLS, INC.,

Defendants-Appellees.

_____

DECIDED:  June 7, 2005

_____

Before LOURIE, SCHALL, and PROST, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

Air Turbine Technology, Inc. ("ATT") is the owner of United States Patent No. 5,439,346 ("the '346 patent").  ATT sued Atlas Copco AB ("ACAB"), Atlas Copco Tools AB ("ACTAB"), Atlas Copco North America, Inc., and Atlas Copco Tools, Inc. (collectively, "Atlas") in the United States District Court for the Southern District of Florida for infringement of the '346 patent, for violation of the Lanham Act, and for unfair competition under Florida law.  In the same action, ATT sued ACTAB separately for breach of contract, fraud, and breach of confidential relationship.  ATT now appeals from the final judgment of the district court that was adverse to it on all of its claims.  <u>Air</u>

<u>Turbine Tech., Inc. v. Atlas Copco AB</u>, No. 01-8288-CIV (S.D. Fla. Nov. 13, 2003) ("<u>Final Judgment</u>").  We affirm.

BACKGROUND

I.

ATT, located in Boca Raton, Florida, is a manufacturer of pneumatic industrial tools.[1]  One of its products is a "governed turbine pencil grinder."  This is a tool that has a high-speed grinding bit at one end and is typically used for high-precision work, such as engraving.  Among the various means of powering pencil grinders, the turbine engine has several advantages, such as reduced noise and fewer maintenance requirements.  However, at least as used in grinding tools, turbines have the disadvantage of losing power under load.  This means that the rotation speed of the grinding bit tends to decrease as resistance is applied to it.  So, for example, a person using a turbine grinder to engrave a piece of metal might find that the rotation speed of the grinder's bit decreased as the bit was applied against the surface of the metal.

ATT acquired U.S. Patent No. 4,776,752 ("the '752 patent") in an effort to overcome this power-loss shortcoming of turbine grinders.  The '752 patent, entitled "Speed Governed Rotary Device," claims a "governor" that can be used to control (or govern) the rotary speed of a turbine grinder.  ATT used this technology to develop several governed-turbine models of its pencil grinder, one of which was the Model 201A grinder.  ATT believed that this new tool overcame many of the power-loss problems experienced by turbine pencil grinders.

---

[1]    Generally speaking, pneumatic tools are tools that operate using compressed air or some other compressed gas.

04-1387                                    2

Atlas is a large power-tool distributor based in Sweden. It is comprised of multiple corporate entities, one of which is ACTAB, its worldwide distribution subsidiary. One of the many products marketed by Atlas, and distributed by ACTAB, is a high-speed pencil grinder. On May 1, 1992, ACTAB and ATT entered into a Private Brand Agreement ("PBA") under which ACTAB obtained the rights to market and sell ATT's Model 201A grinder worldwide, with the exception of the United States and Canada. The PBA included, among others, the following provision protecting ATT's intellectual property:

> AC[TAB] will not exploit ATT's technology covered by ATT's patents. ATT will inform AC[TAB] well in advance before implementing any modifications or improvements of the Product. This provision is valid for the life of the patent (including applicable application periods).

Operating under the PBA, Atlas marketed the Model 201A pencil grinder as the "TSF06." Atlas intended to eventually sell the TSF06 worldwide (with, presumably, the exception of the Untied States and Canada). It never did so, however, because in March 1993, ATT terminated the PBA.[2]

Several years later, ATT acquired ownership of the '346 patent, which relates to an "automatic braking mechanism" for turbine grinders and other rotary devices. The patent is based on an application filed on September 16, 1993, by Gregory A. Bowser and Edward C. McCollough. It describes a braking mechanism that uses pressurized fluid, such as air, to enable or inhibit the rotation of, for example, a turbine's rotor. The braking mechanism is located inside of a chamber that is adjacent to the rotor. '346 patent, col. 3, ll. 22-23. The mechanism consists, in part, of a spring and a brake pad

---

[2] ATT contends that it rescinded the contract because Atlas was in breach for failing to make timely payments. That issue is not before us in this appeal.

04-1387                                    3

that are oriented in such a manner that, in the absence of external forces, the spring exerts pressure on the brake pad so as to push the brake pad into the rotor, thereby inhibiting rotation. Id. col. 5, ll. 33-50. However, when compressed air flows through the chamber, an exhaust pressure is created that is greater than the ambient pressure normally present in the chamber. This in turn exerts a force on the brake pad greater than, and opposite to, the force exerted on it by the spring, thereby pushing the brake pad away from the rotor and enabling rotation. Id. col. 5, ll. 12-21. The automatic braking mechanism can therefore be summarized as follows: in the presence of a compressed fluid, the braking mechanism enables rotation of the rotor; in the absence of a compressed fluid, the braking mechanism inhibits rotation of the rotor. Id. col. 5, ll. 47-57.

At some point after ATT terminated the PBA with ACTAB, Atlas began looking for other suppliers of pencil grinders. Atlas found Schmid & Wezel GmbH & Co. ("Schmid"), a German company, to be a suitable supplier and, in 1999, entered into a PBA with Schmid for turbine pencil grinders. Atlas marketed the Schmid pencil grinder as the "TSF07" and began selling it in October 1999. Atlas continued to sell the TSF07 until the spring of 2001, when it received notice that ATT believed the TSF07 incorporated an automatic braking mechanism that infringed the '346 patent.

II.

On April 6, 2001, ATT sued Atlas in the Southern District of Florida. ATT's first amended complaint alleged a total of six causes of action: (1) infringement of the '346 patent; (2) unfair competition under section 43 of the Lanham Act, 15 U.S.C. § 1125; (3) breach of contract; (4) fraud; (5) breach of confidential relationship; and (6) unfair

04-1387                                           4

competition under Florida law.  (First Am. Compl. ¶¶ 18-50.)  Counts one, two, and six were asserted collectively against Atlas, while counts three, four, and five were asserted separately against ACTAB.[3]

The patent infringement and unfair competition claims asserted against Atlas were all alleged to arise from Atlas's marketing of the TSF07 grinder subsequent to ATT terminating the PBA with ACTAB.  ATT's theory with respect to count one—patent infringement—was that the TSF07 marketed by Atlas incorporated an automatic braking mechanism that infringed the '346 patent.  (Id. ¶ 14.)  ATT based its Lanham Act claim of count two on a theory of false advertising.  Specifically, ATT alleged that Atlas made the TSF07 to look like the TSF06 and that it advertised the TSF07 as having the same governed turbine characteristics as the TSF06, when in fact the TSF07 did not have such capabilities.  (Id. ¶¶ 27-28.)  ATT alleged that this false advertising caused consumer confusion as to product origination and, moreover, caused consumers to stop buying the TSF06 because they believed it had the same inferiorities as the TSF07.  (Id. ¶¶ 29-32.)  In other words, ATT alleged that consumers were not satisfied with the TSF07 because it lacked the advertised "governed turbine" feature and that, because of the falsely advertised similarities to the TSF06, they stopped buying the TSF06.  With respect to the unfair competition claim under Florida law, count six, ATT similarly alleged that Atlas had falsely represented the TSF07 as having the same characteristics as the TSF06 and thereby caused consumer confusion as to product origination.  (Id. ¶¶ 48-49.)

---

[3]    Counts three, four, and five were also asserted against ACAB, but ACAB was subsequently dismissed from the suit for lack of personal jurisdiction.  Air Turbine Tech., Inc. v. Atlas Copco AB, 235 F. Supp. 2d 1287, 1290-91 (S.D. Fla. 2002).

The three causes of action asserted separately against ACTAB arise from ATT's perceived breach of the PBA by ACTAB. Indeed, ATT based its breach of contract claim, count three, on its belief that ACTAB's marketing of the competing TSF07 product breached the promise ACTAB made in the PBA not to exploit any of ATT's technology during the life of ATT's patents. (Id. ¶¶ 34-37.) ATT specifically alleged that ACTAB exploited its technology by marketing a product that infringed the '346 patent. (Id. ¶ 36.) Along these same lines, ATT alleged that ACTAB also committed fraud, count four, by entering into the PBA under false pretenses and with the intent to steal ATT's technology. (Id. ¶¶ 39-40.) Finally, ATT alleged in count five that ACTAB acquired a position of trust by entering into the PBA and gaining access to ATT's proprietary and confidential technology. (Id. ¶ 43.) According to ATT, ACTAB then breached this confidential relationship when it "used and disclosed [ATT's] information to others in the sale and promotion of ACTAB['s] . . . tools incorporating [ATT] technology." (Id. ¶ 44.)

III.

Trial on all claims was set to begin the week of October 6, 2003. Air Turbine Tech., Inc. v. Atlas Copco AB, et al., No. 01-8288-CIV (S.D. Fla. May 5, 2003) ("Order Setting Trial"). However, on September 23, 2003, the district court granted Atlas's motion for summary judgment on the unfair competition, breach of contract, and fraud claims. Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1334, 1349 (S.D. Fla. 2003) ("Summary Judgment"). ATT's two remaining claims of patent infringement and breach of confidential relationship proceeded to trial as scheduled.

With respect to ATT's false advertising claim under the Lanham Act, the court granted summary judgment for Atlas on the ground that ATT had not produced any evidence suggesting it was Atlas's false advertisements that caused consumers to not buy ATT's product. Id. at 1344-46. The court summarized "ATT's evidence of causation" as "sworn testimony from its employees and distributors that customers told them at trade shows that they will not buy ATT's tool because they have an Atlas Copco tool just like it and it does not operate as they would like." Id. at 1344. The court found that, with the exception of one affidavit, the employee and distributor testimony did not go to the ultimate issue of causation. That was because, although the testimony suggested that customers stopped buying the ATT tool as a result of dissatisfaction with the Atlas tool, it did not suggest that customers stopped buying the ATT tool as a result of Atlas's false advertisements. Id. Additionally, the court concluded that Mr. Verbruggen's affidavit—which was the one affidavit that did suggest a causal link to Atlas's advertisements—was based on inadmissible hearsay. Id. at 1344-45.

The district court also granted Atlas summary judgment on the breach of contract claim because it concluded that ATT had not shown that Atlas exploited any of ATT's patented technology. Id. at 1346-47. In particular, the court concluded that, as a matter of law, use of technology covered by the '346 patent (relating to the automatic braking mechanism) could not form the basis of the breach of contract claim because the application for the '346 patent was not filed until after ATT terminated the PBA. Id. at 1346. The court noted that while a claim could have been made based on exploitation of the '752 patent (relating to the governor system), ATT did not advance such a claim. Id. at 1346-47 ("Plaintiff has framed the alleged breach in its amended complaint as

infringement of the '346 patent.").[4]  In addition, the court ruled that "exploit" means actual or productive use of technology covered by an ATT patent.  Accordingly, the court held that "[s]imply advertising a similar product using descriptions similar to the descriptions used by ATT is not exploiting ATT's technology.  It may be exploitation of advertising materials, or false advertising or a trademark violation, but such acts are not exploitation of technology."  Id. at 1347.

With respect to the fraud claim, the district court granted summary judgment for ACTAB because it concluded that "ATT [had] not presented more than a scintilla of evidence regarding ACTAB's intent to fraudulently induce ATT into a contractual relationship."  Id. at 1348.  The district court also granted Atlas summary judgment on ATT's claim for unfair competition under Florida law because the claim did not add anything beyond what the court had addressed already in the Lanham Act and breach of contract claims.  Id. at 1348-49.

As mentioned, the district court denied summary judgment as to the claims for patent infringement and breach of confidential relationship, and so those two claims proceeded to trial.  Prior to trial, the district court denied ATT's expedited motion requesting an order to require testimony via live video conference.  Air Turbine Tech., Inc. v. Atlas Copco AB, 217 F.R.D. 545, 546-47 (S.D. Fla. Sept. 3, 2003).  As a result, and due to the fact that many of Atlas's employees are Swedish citizens, much of ATT's testimonial evidence was presented to the jury by recitation of deposition transcripts.  Atlas also succeeded in having two of ATT's witnesses—Dr. Jerome Catz and Gregory

---

[4]  The district court also noted the inconsistency of alleging false advertising based on a lack of a governed turbine in the TSF07 on the one hand, and in alleging breach of contract based on the use of the governed turbine covered by the '752 patent on the other.  Summary Judgment, 295 F. Supp. 2d at 1347 n.10.

Bowser—barred from testifying at trial on the issue of infringement. The trial lasted about three weeks and, on October 29, 2003, the jury returned a verdict against ATT on both its infringement and breach of confidential relationship claims. The district court entered final judgment as to all six of ATT's claims on November 14, 2003. Final Judgment.

ATT subsequently filed a motion for a new trial on its patent infringement claim based on, among other things, the district court's evidentiary rulings excluding the testimony of Dr. Catz and Mr. Bowser. On April 20, 2004, the district court denied ATT's motion. Air Turbine Tech., Inc. v. Atlas Copco AB, No. 01-8288-CIV, slip op. at 9-10 (S.D. Fla. Apr. 20, 2004) ("Order Denying Plaintiff's Motion for New Trial"). In the same order, the court also stayed, pending appeal, Atlas's motion for costs and attorney's fees. Id.

ATT has timely appealed from the final judgment of the district court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

On appeal, ATT challenges the grant of summary judgment to Atlas on the false advertising[5] and breach of contract claims, as well as the denial of its request for a new trial on its patent infringement claim. We turn first to the district court's summary judgment rulings.

---

[5] ATT concedes that the requirements for a false advertising claim are the same under Florida law as under the Lanham Act. Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994). Accordingly, our review is limited to the Lanham Act false advertising claim.

## I.

As discussed, the district court granted summary judgment for Atlas on ATT's Lanham Act false advertising claim because the court found that ATT had not provided admissible evidence to suggest Atlas's false advertising caused consumers to stop buying ATT's product. Rather, the court found that, at most, ATT's admissible evidence only suggested that consumers stopped buying ATT's product because they were not satisfied with Atlas's product. Summary Judgment, 295 F. Supp. 2d at 1344-45. With respect to the breach of contract claim, the district court granted summary judgment to Atlas because it found that ATT did not provide evidence to suggest that Atlas had exploited any of ATT's patented technology covered by the PBA. Id. at 1346-47. The court held that "exploit," as used in the PBA, required actual or productive use of ATT's patented technology and therefore, as a matter of law, advertising a product as having similar characteristics as ATT's products could not be considered exploitation of ATT's technology. Id. at 1347.

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When we are dealing with an issue not unique to patent law, the applicable substantive law is that of the appropriate regional circuit, in this case, the Eleventh. Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1363 (Fed. Cir. 2004). As in the Federal Circuit, see TorPharm Inc. v. Ranbaxy Pharms., Inc., 336 F.3d 1322, 1326 (Fed. Cir. 2003), in the Eleventh Circuit, review of a district court's grant of summary judgment is de novo, Vector Prods., Inc. v. Hartford

Fire Ins. Co., 397 F.3d 1316, 1318 (11th Cir. 2005).  Under Eleventh Circuit law, "[a]n issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Id. at 1260.  The movant carries the initial burden of proving that there are no genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  If the movant shows a prima facie case for summary judgment, then the burden of production shifts to the nonmovant to present specific evidence indicating there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."  Caterpillar Inc. v. Deere & Co., 224 F.3d 1374, 1379 (Fed. Cir. 2000); see also Tackitt v. Prudential Ins. Co. of Am., 758 F.2d 1572, 1574 (11th Cir. 1985) ("We resolve all reasonable doubts about the facts in favor of the non-movant.").

A.

With respect to the false advertising claim, ATT first argues it was deprived of its due process rights when the district court granted summary judgment for Atlas.  ATT asserts that the case law of both this and the Eleventh Circuit requires that a party have a reasonable opportunity to present its case before a court enters judgment against it.  ATT argues that it was not given this opportunity because the causation theory upon which the district court relied in granting summary judgment was not raised by Atlas but, rather, sua sponte by the district court.  In particular, ATT argues that it had no notice of,

and, consequently, no opportunity to address, the court's findings that Mr. Verbruggen's affidavit consisted of inadmissible hearsay and that ATT had not produced other evidence to suggest it was injured as a result of false advertising by Atlas.

In the alternative, ATT contends that it presented sufficient evidence of causation to survive summary judgment. First, ATT argues that it was not required to submit evidence of "causation of damages" because the elements needed to show a violation of the law are not the same as the elements needed to establish the right to a particular remedy, such as damages or an injunction. Second, ATT argues that it "offered substantial evidence of injury and damages caused by Atlas's false advertising . . . so as to create a genuine issue of fact." Third, ATT contends that, like the plaintiff in Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302 (1st Cir. 2002), it was entitled in the district court to a reasonable inference that "[Atlas's] intentional conduct caused harm to ATT."

In response, Atlas argues that ATT received due process because it put ATT on notice of the causation issue in its Consolidated Motion for Summary Judgment and that causation was discussed at length at the summary judgment hearing. As for ATT's alternative arguments regarding the sufficiency of the evidence, Atlas argues that the Lanham Act requires a plaintiff to provide evidence of both an injury and a causal link between that injury and the allegedly false advertisements, something Atlas maintains ATT failed to do in this case. Atlas also notes that, beyond its due process argument, ATT does not actually contest the district court's ruling excluding the Verbruggen affidavit on the ground that it was hearsay. Atlas lastly argues that while an inference of causation may be reasonable in some circumstances, it is not reasonable in this case,

where ATT is asking the court to infer that Atlas's false advertising caused consumers to "shun all turbine grinders, including ATT's."

We see no error in the district court's grant of summary judgment in favor of Atlas on ATT's false advertising claim. First, we do not think the entry of summary judgment deprived ATT of its due process rights because ATT had a fair opportunity to present its case to the district court and, specifically, to come forward with evidence of causation. ATT was on notice of the causation issue generally because Atlas raised it in its motion for summary judgment.[6] The district court judge and ATT also had a substantial discussion on the issue at the summary judgment hearing. (Summ. J. Hr'g Tr. at 35-41.) In addition, although in the context of the materiality of the alleged deception, Atlas raised the general hearsay issue in its motion for summary judgment. Thereafter, ATT responded to it in opposition to Atlas's motion for summary judgment, arguing that the customer and distributor statements fell within the present-state-of-mind exception to the hearsay rule. (Pl.'s Mem. in Opp'n to Def.'s Consol. Mot. for Summ. J. at 25-26.) In sum, contrary to ATT's contentions, this is not a situation where the nonmovant lacked notice as to the risk of summary judgment so as to deprive the nonmovant of a fair opportunity to present its case. Compare Burns v. Gadsden State Cmty. Coll., 908 F.2d 1512, 1517 (11th Cir. 1990) ("The defendants' . . . motion for summary judgment was 'bare boned.' It failed to apprise plaintiff of the facts and legal theories on the basis of which defendants claimed to be entitled to summary judgment."); Thoen v. United

---

[6] "Even assuming literal falsity and materiality, ATT has no evidence that links an injury, or likelihood of an injury, to the alleged falsity in the accused advertisements. Because of this, its false advertising claim cannot survive summary judgment." (Def.'s Consol. Mot. for Summ. J. at 31.)

<u>States</u>, 765 F.2d 1110, 1115 (Fed. Cir. 1985) (holding that summary judgment was improper where the plaintiff had no notice of the court's decision to render judgment).

Second, we do not think that ATT presented sufficient evidence to survive summary judgment. Atlas is correct that false advertising under the Lanham Act requires, among other things, a showing of both an injury and a causal link between the injury and the allegedly false advertising. <u>Hickson</u>, 357 F.3d at 1260; <u>Johnson & Johnson Vision Care, Inc. v. 1-800 CONTACTS, Inc.</u>, 299 F.3d 1242, 1247 (11th Cir. 2002). Accordingly, ATT's argument distinguishing between the elements required for establishing a claim and those required for establishing the right to a particular remedy misses the point. The critical issue is whether ATT provided evidence sufficient to allow a reasonable juror to find that Atlas's false advertising caused the alleged injuries to ATT. We do not think that it did.

At the summary judgment proceedings, ATT relied on affidavits from its distributors and customers to show causation. The district court correctly determined that these affidavits, with the exception of Mr. Verbruggen's, did not go to the issue of causation. At most, the affidavits suggest that customers were dissatisfied with Atlas's TSF07 product and consequently stopped buying similar products.[7] That, however,

---

[7] For example, Peter Hold, an ATT distributor in Switzerland, stated: "My interest level on promoting Air Turbine Tools decreased with the appearance of a product with the same characteristics from the major manufacturer of power tools." (Decl. of Peter Hold at 2.) Jurgen Uhlarz, an ATT distributor in Germany, similarly stated that "sales of [ATT] tools were negatively affected by the [Atlas] tool and the attitude of prospective customers created by the unjustified claims which [Atlas] made for its TSF07 turbine tool, which claimed to have a governor, but did not have governed performance." (Decl. of Jurgen Uhlarz at 3.) And, Abby Petzenbaum, an ATT distributor in Brazil, stated that "[t]he presence of a product claiming to be equivalent to [ATT] robbed the [ATT] products of the uniqueness of their performance. Our sales

does not provide a causal link between Atlas's false advertising and resulting injury to ATT. In its reply brief, ATT again asserts that Mr. Verbruggen's affidavit was sufficient to show a genuine issue of fact as to whether the false advertising caused ATT's injuries. However, the district court excluded Mr. Verbruggen's affidavit as based on inadmissible hearsay and ATT does not challenge that evidentiary ruling on appeal.

Nor do we think the cumulative evidence submitted by ATT is sufficient to permit an inference of causation. The cases cited by ATT involve situations where a court drew an inference of causation based on evidence of a direct diversion of sales from one competitor to another. In Cashmere & Camel Hair, for example, a fabric wholesaler and a trade association of cashmere manufacturers brought suit against a manufacturer of cashmere products for falsely advertising the cashmere content of its women's blazers, in violation of the Lanham Act. 284 F.3d at 306-07. In opposition to summary judgment, plaintiffs provided evidence that: (1) defendant overstated the percentage of cashmere in its blazers; (2) defendant priced its blazers below the prices offered by plaintiff-wholesaler; and (3) plaintiff-wholesaler had lost business to defendant. Id. at 319-20. Based on this evidence, the First Circuit reversed the district court's grant of summary judgment for defendant, finding that "a rational fact-finder could reasonably infer that the substituted cost savings [defendant] enjoyed from using non-cashmere or recycled cashmere fabric allowed [defendant] to lower the price of its blazers, thereby preventing [plaintiff's] customers from competing in the market." Id. at 319; see also Grove Fresh Distribs. v. New England Apple Prods. Co., Inc., 969 F.2d 552, 557 (7th

---

(Cont'd. . . .)
force was frustrated to work for [ATT] sales in this environment and our efforts to market the product were hindered and stalled as a result." (Decl. of Abby Petzenbaum at 2-3.)

04-1387                                  15

Cir. 1992) (holding that, based on evidence as to the importance consumers placed on the "100% Florida" label, the jury could have inferred that consumers switched to the defendant's product because of its false "100% Florida" label).

This case, by contrast, is not based on a diversion-of-sales theory. Indeed, ATT states that "the damage caused by the false advertising of the TSF07 was not the amount of tools Atlas sold, but rather the destruction of the marketability and distribution of governed turbine grinders and the underlying technology . . . ." (Br. of Appellant at 21.) Therefore, instead of asking for an inference of causation based on diversion of sales, ATT is really asking us to draw an inference based on its contention that Atlas poisoned the entire tool-industry well against governed turbine grinders. That is, ATT contends that Atlas's false advertising caused consumers to stop buying all governed turbine grinders, irrespective of the product's origin. We conclude that such an inference is not warranted based on the evidence of record, and therefore affirm the grant of summary judgment to Atlas.

### B.

Regarding the district court's grant of summary judgment to ACTAB on the breach of contract claim, ATT contends that the court erred in interpreting "exploit" from the PBA to mean "to make productive use of." ATT argues that "exploit" is not so limited, but "extends to all the activities of commercialization and to advertising and promotion." ATT also asserts that the district court's construction effectively limits the type of conduct that could constitute a breach to patent infringement. Such a construction, ATT continues, is too narrow because "technology" is an "extremely broad term" and if the parties had wanted to limit exploitation to patent infringement, they

would have done so. This, according to ATT, is shown by the fact that in another provision of the PBA Atlas promised not to commit patent infringement by "manufactur[ing] or sell[ing] competing products using ATT's air governor system." In short, ATT argues that the disputed contract provision prohibited ACTAB from not only infringing its patents but also from advertising its product as having the resulting benefits of ATT's patented technology.

In response, Atlas argues that the district court correctly interpreted "exploit" as requiring actual or productive use and that the court also correctly interpreted "technology" to mean ATT's patented technology. Atlas argues that, in any event, ATT cannot prevail on its appeal because, while ATT does challenge the district court's contract construction, ATT does not challenge the district court's finding that neither the '346 patent nor the '752 patent could form the basis for the breach of contract claim.

We agree with the district court's interpretation of the scope of ACTAB's promise in the PBA not to "exploit ATT's technology covered by ATT's patents." The district court did not necessarily preclude "advertising" from the scope of the term "exploit." Rather, the district court held that the PBA used "exploit" in conjunction with "technology covered by ATT's patents," so as to limit the types of conduct that could be considered exploitation of ATT's technology. The court provided the following explanation: "Simply advertising a similar product using descriptions similar to the descriptions used by ATT . . . may be exploitation of advertising materials or false advertising or a trademark violation, but such acts are not exploitation of ATT's technology."

Accordingly, we agree with the district court that ATT was required to assert that Atlas exploited—i.e., put into practical use—technology covered by a particular ATT

patent. In its complaint, ATT alleged that Atlas breached the PBA by infringing the '346 patent. However, the district court held that, as a matter of law, the '346 patent could not form the basis of a breach of contract claim because the patent's application was filed after ATT terminated the PBA with ACTAB. ATT does not challenge this holding of the district court. The district court also noted that the '752 patent could form a basis for a breach of contract claim, but concluded that ATT had not asserted it as such. ATT also does not challenge this ruling on appeal. We therefore affirm the district court's grant of summary judgment to ACTAB because ATT neither contests the court's rejection of the '346 and '752 patents as bases for the breach of contract claim nor argues that some other patented technology was exploited.

II.

ATT also argues that the district court should have granted it a new trial on the patent infringement claim because of three prejudicial evidentiary rulings. First, ATT argues that the court erred in preventing its expert witness on infringement, Dr. Jerome Catz, from fully testifying. The district court excluded Dr. Catz's testimony insofar as it went to infringement of a particular means-plus-function limitation, "braking means." The court made this decision pursuant to Fed. R. Civ. P. 37(c)(1) because ATT failed to disclose the content of Dr. Catz's opinion as to infringement of the means-plus-function claim in an expert report as required by Fed. R. Civ. P. 26(a) and 26(e)(1). (Trial Tr. of Oct. 9, 2003, at 148-50.) ATT argues that it was "substantially justified" in not supplementing the report because the court's claim construction—namely, its conclusion that "braking means" was a means-plus-function limitation—was not finalized until just before trial. ATT also argues that under the Fifth Circuit's decision in Texas

A&M Research Foundation v. Magna Transportation, Inc., 338 F.3d 394, 402 (5th Cir. 2003), exclusion of Dr. Catz's testimony was not warranted because it was important to ATT's case; the risk of prejudice to Atlas in allowing the testimony was minimal; and ATT's failure to supplement the report was excused by the court's late claim construction ruling.

Second, ATT argues the district court erred in excluding the testimony of Gregory Bowser, a co-inventor of the '346 patent. ATT called Mr. Bowser to testify as to what he observed when he examined the accused product. Atlas objected on the ground that Mr. Bowser was not an expert and his testimony consequently violated Fed. R. Evid. 701 as testimony of a lay witness on a matter requiring special scientific knowledge. The district court sustained the objection. (Trial Tr. of Oct. 20, 2003, at 74-75.) ATT argues the district court erred because Mr. Bowser's testimony was simply based on his observations of the structure of the accused device.[8] ATT contends that cases such as Tampa Bay Shipbuilding & Repair v. Cedar Shipping Co., 320 F.3d 1213, 1221 (11th Cir. 2003), make clear that Rule 701 does not prohibit a witness from testifying to a matter "rationally based on their own perceptions and experience." And, ATT continues, as a co-inventor of the '346 patent, Mr. Bowser had experience with grinding tools and his testimony related simply to his observations of the structure of the accused device. In other words, ATT argues that Mr. Bowser "was entitled to testify based upon his particularized knowledge and experience to what he observed when he disassembled" the accused product.

---

[8] The structure of the accused device is relevant to whether it reads on the "braking means" limitation. ATT sought to establish, through Dr. Catz and then Mr. Bowser, that the accused device contained the corresponding structure of the "braking means" limitation.

Third, ATT argues the district court erred in denying its expedited motion to require Atlas to produce Swedish-employee witnesses by video teleconference for examination in ATT's case-in-chief. The district court denied ATT's motion because it believed it lacked jurisdiction to compel testimony by non-U.S. citizens. In addition, even if it had jurisdiction, the court stated it did not think ATT had shown "compelling circumstances" under Fed. R. Civ. P. 43(a) to justify such an order because ATT waited until a month before trial to bring the motion and, moreover, this type of situation "occurs all the time" in complex litigation. ATT argues the district court erred because it mistook the motion for a motion to compel, when in fact it merely asked the court to "regulate" testimony by requiring Atlas to present testimony in the same manner as ATT.[9] ATT also contends it has shown "compelling circumstances" to warrant granting its request. To that end, ATT argues that this type of situation—i.e., a situation where one party must present a witness's testimony by reading deposition transcripts even though the other party may later call that same witness into court to give live testimony—is unfair and does not "occur all the time" in litigation. It also urges us to excuse the untimeliness of its motion on the ground that the Joint Pre-Trial Stipulation, which listed likely witnesses to be called by each party, was not filed until after the court decided the expedited motion.

Atlas responds that none of these three rulings by the district court amount to an abuse of discretion. First, with respect to the exclusion of Dr. Catz's testimony, Atlas

---

[9] For example, if ATT was forced to present the testimony of the Swedish-citizen employees in its case-in-chief by reading deposition transcripts, then the proposed order would have required Atlas to do the same in its case-in-chief. In this manner, the motion was intended to eliminate the perceived unfairness of having one party present its evidence to the jury by reading deposition transcripts while the other party used live witnesses.

argues that ATT had ample time to supplement the report because the claim construction ruling came twenty-nine days before trial and did not even relate to the "braking means" limitation.  Furthermore, Atlas stresses that ATT made no attempt to supplement Dr. Catz's expert report after the court issued its ruling.  Second, Atlas argues that the court correctly excluded Mr. Bowser's testimony because "[l]ike Dr. Catz's excluded analysis, Mr. Bowser's testimony was directed to the function and identification of various structures in the [accused device] in an attempt to dodge the consequences of ATT's failure to include the means-plus-function analysis in Dr. Catz's expert report."  Mr. Bowser's testimony, Atlas argues, "is more akin to an engineer's or mechanic's testimony about the technical design of an accused product, which has traditionally been treated as Rule 702 expert testimony."  Third, with respect to the video teleconference issue, Atlas argues that the district court correctly concluded that it lacked jurisdiction to issue such an order and that, in any event, ATT's justification for the motion is undermined by the fact that Atlas did not call any Swedish witnesses at trial.

Although the underlying claim is for patent infringement, the issues presented are not unique to patent law, so we apply the relevant law of the Eleventh Circuit.  In the Eleventh Circuit, "[a] district court's evidentiary rulings are not subject to reversal on appeal absent a clear abuse of discretion."  Tampa Bay Shipbuilding, 320 F.3d at 1216; see also United States v. Myers, 972 F.2d 1566 (11th Cir. 1992).  Under this standard of review, we see no reason to disturb the judgment in favor of ATT on the patent infringement part of the case.

First, we do not think the district court abused its discretion in excluding Dr. Catz's testimony under Fed. R. Civ. P. 37(c)(1) insofar as his testimony exceeded the material disclosed in his expert report. The district court construed "braking means" as a means-plus-function limitation on September 12, 2003 (about one month before trial). Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1327, 1333 (S.D. Fla. 2003) ("Amended Claim Construction Order"). Furthermore, it appears that the issue of whether "braking means" was a means-plus-function claim was in play even earlier. Id. at 1329 (stating that a Markman hearing was held on August 8, 2003). It is true that the district court later amended its claim construction, but it did not change its prior ruling that "braking means" is a means-plus-function limitation. Air Turbine Tech., Inc. v. Atlas Copco AB, 2003 WL 22939357 (S.D. Fla. Oct. 3, 2003) ("Second Amended Claim Construction Order"). Under these circumstances, ATT should have at least attempted to supplement Dr. Catz's expert report. See Fed. R. Civ. P. 26(e) (requiring a party to supplement expert reports).

Second, we do not think the district court abused its discretion in excluding the testimony of Mr. Bowser. Relevant excerpts of Mr. Bowser's testimony are as follows:

> Q: When you disassembled and inspected the Biax T365 brake, what did you find?
>
> A: When I removed the end cap, first of all I saw the brake pad that was supported by a spring, and also the fact that the tool was a rear exhaust tool, which was known, because it was exactly like the Air Turbine tool as far as the exhaust path.

Q: Now, were you able to see how the brake pad was secured to the T365?

A: Yes. There was -- the guide post for that particular tool was a multi-sided post as opposed to a round, circular post. The brake pad was also matching multi-sided that could slide over the post. Obviously, since it was not round, though, that is what kept the brake pad from rotating.

(Trial Tr. of Oct. 20, 2003, at 69.)[10] Mr. Bowser's testimony refers to both the structural components of the accused device and to their respective functions. Moreover, the fact that Mr. Bowser may have particularized knowledge and experience as a co-inventor of the claimed invention does not necessarily mean he also has particularized knowledge and experience in the structure and workings of the accused device. Under these circumstances, we cannot say that the district court abused its discretion in concluding that Mr. Bowser's testimony amounted to improper expert testimony.

Third, we do not think the district court abused its discretion in denying ATT's motion to order testimony via video teleconference. Even assuming the district court had power to issue such an order, the motion involved a matter expressly reserved to the sound discretion of the trial court. Fed. R. Civ. P. 43(a) ("The court may, for good cause shown in compelling circumstances, . . . permit presentation of testimony in open court by contemporaneous transmission from a different location." (emphasis added)). The district court stated that ATT should not have waited until one month before trial to file its motion and that requiring ATT to read the deposition transcripts of the foreign witnesses would not give Atlas an unfair tactical advantage because "[t]his

---

[10]    The Biax T365 is, presumably, an Atlas product similar to the TSF07 accused of infringing the '346 patent.

circumstance occurs all the time" in civil litigation. We cannot say that the district court abused its discretion on this point.

## CONCLUSION

We hold that, as to the appealed summary judgment decisions, the district court correctly determined that there were no genuine issues of material fact so as to preclude judgment for Atlas. We also hold that the district court did not abuse its discretion in connection with any of the three challenged evidentiary rulings. We therefore do not disturb the court's denial of ATT's motion for a new trial on its claim of patent infringement. For these reasons, the final judgment of the district court is affirmed.

## COSTS

Each party shall bear its own costs.

## AFFIRMED