**FIRST HEALTH GROUP CORP., a Delaware corporation, formerly known as HealthCare Compare Corp., d/b/a The First Health *AFFORDABLE* Medical Networks, Plaintiff,**

v.

**UNITED PAYORS & UNITED PROVIDERS, INC., a Delaware corporation, etc., et al., Defendants.**

No. 96 C 2518.

United States District Court,
N.D. Illinois,
Eastern Division.

March 21, 2000.

Michael L. Childress, Christopher N. Mammel, Childress & Zdeb, Ltd., Chicago, IL, Amy L. Edwards, Potratz v. Hollander, P.C., Chicago, IL, for Plaintiff.

Robert George Krupka, David Kenneth Callahan, Ronald C. Provenzano, Pamela Anne Kilby, Matthew P. Hammatt, Paul R. Steadman, Kirkland & Ellis, Chicago, IL, for Defendants.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

The parties have filed cross-motions for summary judgment on plaintiff's Lanham Act claims. For the reasons we hereafter discuss, we grant defendant's motion and deny plaintiff's motion.

In the somewhat fluid area of health care delivery, First Health Group Corp. (First Health) has emerged as a leading intermediary between health care providers (hospitals) and health care payors, such as employee and union welfare plans. It contracts with hospitals to obtain medical services at reduced rates, on average a little less than a 40 per cent discount. It has arrangements with payors whereby the payors require the covered person to use the services of one of the hospitals under contract to receive the full benefits of the plan. Those hospitals are known as preferred providers and First Health describes itself as a preferred provider organization or PPO. First Health does not profess to grant exclusive rights to a particular hospital in an area, but it is somewhat selective. In an area from which several hospitals draw patients, it will contract with some but not all of those hospitals. The hospitals, in turn, do not normally deal with only one PPO. Since a failure to contract with a PPO may cause patients who would otherwise use that hospital to be directed elsewhere, there is an incentive for hospitals to contract with a number of PPOs. First Health contracts with approximately 2900 to 3000 of the approximately 5300 hospitals in the United States.

United Payors & United Providers, Inc. (UP & UP) operates in a considerably different fashion. It contracts with hospitals and extends to them what is in effect a continuing loan, by prepayment of services. It does not generally require its payors to direct covered persons to those hospitals. Persons who do go to one of those hospitals learn, after the services have been provided, that they have been billed for their share of the bill at a discounted rate (an average 20 per cent), which may encourage them to return to such a hospital for any additional services. UP & UP contracts with approximately 2500 hospitals.

Plaintiff claims that UP & UP violates the false advertising provisions of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by routinely representing to hospitals that it operates a preferred provider network, that the payor clients represent a certain number of "covered lives," and that its payors use "shared savings" as a financial incentive to direct or channel or steer patients to contracting hospitals. At the core of plaintiff's claims is the contention that defendant has deceived hospitals by causing them to believe that it operates a network that directs or channels or steers patients to contracting hospitals; they argue that "preferred provider network" necessarily implies steerage by indicating that the hospital is "preferred"; that the references to "covered lives" has the same implication because it indicates that the

"covered lives" are encouraged to use that hospital; and that "shared savings," as a financial incentive, also implies steering, even though the patient at most is aware of a discount from his or her share of the bill after the services have been rendered. The use or "misappropriation" of such "directed PPO" terminology by defendant, according to plaintiff, has deceived and confused a significant portion of the contracting hospitals. Plaintiff contends that it has suffered reduced discounts as a result of the false advertising and has also lost the business of a major federal payor, Government Employees Hospital Association (GEHA).[1]

Defendant moves for summary judgment, contending that the representations are at most arguably ambiguous and that in those circumstances plaintiff must prove that defendant's false advertising has deceived a significant portion of the consumer population, *i.e.*, hospitals. It argues that the opinions of experts, unsupported by market surveys or studies, and the anecdotal evidence respecting a few hospitals, is not enough to sustain that burden. Plaintiff disagrees. First Health further contends that the representations are literally false and therefore deception and confusion are presumed; and that, even if it can prove only a tendency to deceive, it still can recover UP & UP's ill-gotten profits as an equitable remedy.

We turn, first, to the legal standards. We emphasize that the parties are not before this court on a petition for a preliminary injunction. In those circumstances a tendency to deceive may win the day if the balancing against other factors so dictates. Refraining from making some statement may be of a great importance to a plaintiff and of marginal significance to a defendant while they explore the facts through discovery. But here discovery has closed and the parties need to know what monetary exposure there may be. Plaintiff is seeking over $60,000,000, a not inconsiderable sum.

Those standards, for monetary recovery, are well established:

Under the federal Lanham Act, which generally proscribes the false description of goods and their origins, the plaintiff must show that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (3) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff. *See Grove Fresh Distribs, Inc. v. New England Apple Prods. Co.*, 969 F.2d 552, 557 (7th Cir.1992), citing *Skil Corp. v. Rockwell Int'l Corp.*, 375 F.Supp. 777, 783 (N.D.Ill.1974); *see also Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1383 n. 3 (5th Cir.1996); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3d Cir.1992); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 963–64 (D.C.Cir.1990) (Thomas, J.); *Cook, Perkiss & Liehe, Inc.v. Northern California Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir.1990). Where the statement in question is actually false, then the plaintiff need not show that the statement either actually deceived consumers or was likely to do so. But where the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is "'misleading in context, as demonstrated by actual consumer confusion.'" *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir.1994), quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir.1992); *see also, e.g., United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180–81, 1182–83 (8th Cir.1998) (collecting cases).

---

1. Plaintiff does not claim that GEHA was itself deceived. Rather, it contends that GEHA contracted with UP & UP because defendant had developed a large provider network by means of its false advertising. We are advised that defendant now acts as a "directed PPO" in those states for which it has contracted with GEHA.

848

B. *Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971–972 (7th Cir.1999) (footnotes omitted).

Plaintiff advances two reasons why it need not prove actual or likely confusion of a substantial segment of the consumer audience. First, it contends that the representations are actually or literally false. That conclusion rests, ultimately, upon the supposition that a PPO necessarily includes patient-steering. Here, after all, the contracting hospital obtained the opportunity for prepayment; access to a substantial number of "covered lives" for which it could expect prompt payment; and the possibility that a patient, having become aware of his or her reduced copayment, would choose that hospital again. While the parties may well (and do) dispute the value of those benefits, they surely have some value and the hospital is preferred to that extent. And, as we shall shortly see, the definition of "PPO" is not cast in stone compelling the conclusion that steering is invariably part of it. The representations are not literally false.

A second reason why significant actual confusion need not be proved is, according to plaintiff, because it will be entitled to equitable relief if the representations tend to confuse, and equitable relief includes recovery of the wrongdoer's profits. *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir.1985). Profits are awarded under different rationales, including unjust enrichment, deterrence and compensation. *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931 (7th Cir.1989). And we are mindful that a plaintiff need not prove actual injury to sustain a Lanham Act violation, at least for the purpose of 15 U.S.C. § 1125(a)(1)(A). *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202 (7th Cir.1990). Indeed, the inability to prove actual injury is the reason to turn to alternate remedies. We believe, however, that the availability of equitable remedies does not invoke the standard for preliminary equitable relief. It indeed would be anomalous if a plaintiff able to prove actual injury must establish deception or likely deception of a significant portion of consumers, but a plaintiff who cannot prove actual injury need only prove that ambiguous representations may have a tendency to confuse some consumers in order to appropriate the defendant's profits.

What evidence, then, does plaintiff have of actual or likely confusion of a significant portion of consumers, and what evidence must it have? Plaintiff relies primarily upon the testimony of expert witnesses, who, having reviewed the representations made, opine that almost all hospitals contracting with UP & UP must have been deceived by those representations into believing that UP & UP would be steering patients to contracting hospitals. It also relies upon the testimony or hearsay representations of a few hospital representatives who, upon learning that defendant did not steer patients, either decided not to contract with UP & UP or, in some instances, terminated their relationship with defendant. Plaintiff has no evidence that any hospital ceased doing business with it because it believed that it would receive comparable steering from defendant: some hospitals have ended their relationship with plaintiff, but they have done so because the loss of GEHA business reduced the volume of plaintiff's "covered lives." Plaintiff has no survey evidence.

■ Survey evidence is the customary way of proving significant actual deception, although consumer data, market research or evidence of diverted sales (none here) may sometimes be sufficient. Common sense and personal experience alone are not enough. *American Council of Certified Podiatric Physicians and Surgeons v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir.1999); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir.1993); *Johnson & Johnson*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294 (2nd Cir.1992). A survey is not

critical to obtaining preliminary injunctive relief, *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6 (7th Cir.1992); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir. 1988), but proof of actual or likely confusion of a significant portion of consumers requires a survey or at least some other persuasive means. The personal opinion of an expert as to what a consumer would understand is not enough. *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 136 (3d Cir. 1994).[2] That a few hospitals may have misunderstood or did misunderstand defendant's representations as providing for steering is also not enough.[3] *William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255 (9th Cir.1995). "A 'misunderstood' statement is not the same as one designed to mislead." *Mead Johnson & Company v. Abbott Laboratories,* 201 F.3d 883 (7th Cir. 2000).

We think those conclusions are particularly compelling when viewed from the context of this lawsuit. For the past five years or so there has been an ongoing struggle between PPOs providing steering or directing ("directed PPOs"), and organizations providing services similar or somewhat similar to those of defendant. Those who contend that a non-directed PPO is not a PPO refer to such organizations as "silent PPOs," a pejorative term. Addressing concerns expressed by the American Hospital Association and American Medical Association, a congressional committee requested a review of federal practices so as to ensure that "silent PPOs" were not obtaining discounts to which they were not entitled. The report issued February 26, 1998, by the Inspector General of the Office of Personnel Management includes the following:

> ... One cost control method used by fee-for-service carriers is known as a Preferred Provider Organization (PPO). A PPO is a group of medical providers who agree to provide medical services to the subscribers of an insurance carrier at a lesser cost than would have been otherwise charged. The perception is that in a traditional PPO, the PPO would employ some method of controlling benefit utilization by subscribers and would manage medical care more cost effectively. They might also establish controls to improve the quality of care. In exchange for a preferred status, lower fees, and better care, the carrier would attempt to steer its subscribers to the PPO's medical providers through such methods as financial incentives, ID cards, and preferred provider lists. Thus, significant savings could be achieved by the carrier which would reduce its premium costs.

> In recent years, a new variation of the PPO concept appeared. This variation is known as a "non-directed" PPO as distinguished from the traditional PPO which has become known as a "directed" PPO. The terms "directed" and "non-directed" are references to the steerage or lack of steerage of patients. As explained above, in a traditional directed PPO arrangement, subscribers are steered to the PPO to take advantage of the lower costs. In a "non-directed" PPO, even though the medical providers have agreed to charge a lower fee, the contract[s] the PPOs enter into do not require that the carrier's subscribers be

---

**2.** Defendant has moved to strike one of plaintiff's expert reports, the Ottati Expert Report. That motion is denied. The expert has impressive credentials, and how language is understood is within his expertise, although his lack of consideration of some factors and the lack of empirical support for his views do raise questions. His personal opinion is, however, insufficient to support this claim for over $60,000,000, in any event, and in those circumstances we see no compelling reasons to strike the report.

**3.** As one might expect, some temporary (and inactionable) consumer confusion may occur as industries realign themselves based on new products or services and as old terms acquire new meanings.

steered to them. In some non-directed PPOs, the [provider] may benefit from this arrangement as a result of prompt payments or advances. In other non-directed PPO arrangements, the benefits to the provider may be less clear. In the case of both the directed and non-directed PPOs the terms of the arrangement are committed to a contract between the parties . . . .

\*       \*       \*       \*       \*       \*

Concurrent with the evolution of non-directed PPOs, a new term, "silent PPO" became commonplace. The term, "silent PPO," means different things to different people. Initially, the term "silent PPO" was merely a reference to a non-directed PPO where the contract was "silent" with regard to the steerage of patients to the provider's facilities. However, in more recent times, the term has acquired a more restrictive meaning. As a result, to some people, "silent PPO" describes a payment scheme used to obtain illegal discounts for payers who are not entitled to them. In discussions with interested parties and in industry literature, the terms "fraud," "illicit," "manipulation," "falsely," "unethical," and "scheme" are frequently used to describe silent PPOs. Consequently, the term "silent PPO" has come to mean an unethical and/or illegal practice, and the term has been loosely extended to inappropriately encompass non-directed PPOs. For the purpose of our review, we have differentiated between the terms "non-directed PPO" and the more restrictive term "silent PPO." Since "silent PPO" activity would be inappropriate for the [Federal Employee Health Benefits Program], we were concerned with the implication that it may exist in the FEHBP.

A "silent" PPO is distinguished from a "non-directed" PPO by the nature of the contractual relationship between the parties. As stated above, in a "non-directed" relationship, discounts are taken pursuant to contractual arrangements that can be traced from the payer (i.e., the insurance carrier) to the medical provider. In a "silent PPO," a contractual relationship cannot be traced from the payer to the medical provider from whom the discount is taken. Typically, in a silent PPO arrangement, another PPO will sell its medical provider's names and discounted fee information, often without the provider's knowledge and permission, to a secondary market of vendors. These vendors then access the information on behalf of their payer clients, recalculating the provider's fee based on the discounted fee information. It has been alleged that sometimes, the payer may claim a non-existent affiliation with the provider by inaccurately declaring that the patient is a member of a PPO to which the provider is a member.

\*       \*       \*       \*       \*       \*

Our review disclosed that substantial savings have been and can be achieved by both directed and non-directed PPOs. We further found these savings can be achieved in an ethical manner, in that we found no evidence in the FEHBP that "silent PPOs" were a factor or that provider discounts were otherwise taken on the basis of any schemes to victimize medical providers. In addition, we found FEHBP carriers and their vendors were, except for some minor exceptions, accessing discounts in accordance with the terms of their contracts with providers . . . . .

\*       \*       \*       \*       \*       \*

. . . We conclude that substantial sums can be saved through directed and non-directed PPO arrangements. In view of the fact that directed PPOs provide for steerage of patients, as would be expected, directed PPO savings are significantly larger than non-directed PPO savings.

Office of the Inspector General, Office of Personnel Management, Rep. No. 99–00–97–054, Report on the Use of Silent PPOs

in the Federal Employees Health Benefits Program 20–23 (1998).

Following that report, legislation was reported out by the Senate Committee on Governmental Affairs. The Committee's report notes the following:

> ... The incentives may include an agreement to steer patients to the provider, in the case of so-called "directed PPOs," or they may include financial incentives such as prepayment or prompt payment in the case of so-called "non-directed PPOs." Both directed and non-directed PPOs provide legitimate and valuable benefits to health care providers, carriers, and patients.

Senate Committee on Governmental Affairs, S.Rep.No. 257, 105th Cong., 2d Sess. 3 (1998).

Those reports indicate that "PPO" does not have a fixed definition which includes a steering requirement. A survey of state laws in the health care field ("surveys," actually, because plaintiff has pointed to statutes that lend credence to its position and defendant has pointed to others that lend credence to its position) indicates the same. Those states hostile to non-directed PPOs, including plaintiff, have engaged in an educational campaign intended to alert hospitals to what they consider to be the fraud of organizations which bill themselves as PPOs but do not direct patients. It is hard to believe that even the smallest hospitals are not aware of the difference between a directed and a non-directed PPO. As we have noted, some hospitals have professed to having been misled, but they have done so in a context in which they have been repeatedly told that they were misled. Further, hospitals are not unsophisticated consumers. *See American Council of Certified Podiatric Physicians and Surgeons, supra,* at 616. Hospitals contracting with UP & UP have written contracts, generally reviewed by their counsel, which spell out the obligations of the parties. The UP & UP contracts of which plaintiff complains do not contain any promise by defendant to direct pa-

tients to the contracting hospital. Plaintiff's experts, in concluding that all or virtually all hospitals were misled by UP & UP, did not take into account the ongoing lobbying efforts, directed both to Congress and hospitals, nor the fact that the contracts were generally reviewed by the hospital's attorneys and by hospital personnel knowledgeable in the field. They do not explain why almost all the contracting hospitals, supposedly the victims of deception, have chosen to continue their relationships. They do not note that no federal agency, no state attorney general, no state insurance carrier and no hospital (with one possible exception) have taken any legal action complaining about the matters of which plaintiff complains here. We conclude, in short, that there just is not enough evidence of a Lanham Act false advertising claim to get to a jury.