Although defendants in this case had good reason to think that plaintiff was likely to bring suit against it *eventually,* they "jumped the gun" by bringing suit at a time when plaintiff believed negotiations were still underway. Although one of plaintiff's April 6, 2006 letters made reference to the possibility of future litigation, the second letter provided defendants with documents they had requested in order to resolve the parties' dispute. There is no reason to believe that plaintiff was dilatory in waiting from April 6, when it wrote defendants, until June 2 to file this suit. In fact, there is every reason to think that plaintiff was prudently awaiting a final decision from defendants before initiating costly and time-consuming legal action. By racing to the courthouse before responding to plaintiff's legitimate attempts at negotiation, defendants engaged in the type of forum shopping disfavored under Seventh Circuit law. *Tempco Elec. Heater Corp.,* 819 F.2d at 750; *American Automobile Insurance Co. v. Freundt,* 103 F.2d 613, 617 (7th Cir.1939) ("The wholesome purpose of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum.").

Because plaintiff's position in both this case and the case pending in the Northern District is "offensive" rather than defensive, plaintiff is the "natural plaintiff" in the parties' dispute. The law favors providing plaintiff with its choice of forum, and I see no reason to deny plaintiff its choice of forum in this case. Therefore, defendants' motion will be denied.

## ORDER

IT IS ORDERED that the motion to dismiss of defendants Nucleic Acids Licensing, LLC and Steven Benner is DENIED.

**LAND'S END, INC., Plaintiff,**

v.

**Eric REMY, Thinkspin, Inc., Braderax, Inc., and Michael Seale, Defendants.**

No. 05–C–368–C.

United States District Court, W.D. Wisconsin.

Sept. 1, 2006.

James A. Friedman, for Plaintiff.

Eric Remy, Stamford, CT, pro se.

Joseph S. Goode, Whyte Hirschboeck Dudek, S.C., Andrew J. Clarkowski, Michael J. Modl, Axley Brynelson, Madison, WI, for Defendants.

## OPINION and ORDER

CRABB, District Judge.

In this civil action for declaratory, injunctive and monetary relief, plaintiff Lands' End, Inc. contends that defendants Eric Remy, Thinkspin, Inc., Braderax, Inc. and Michael Seale have violated the Lanham Act, 15 U.S.C. § 1125(a), the Anticy-

bersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A), Wis. Stat. § 100.18 and state common law by collecting commissions from plaintiff through a practice known as "typo squatting." Jurisdiction is present under 28 U.S.C. §§ 1331 and 1367.

Now before the court is the motion for summary judgment filed by defendants Thinkspin, Inc., Braderax, Inc. and Michael Seale. (Defendant Eric Remy is not a party to this motion. Consequently, all references to "defendants" in this opinion will be to Thinkspin, Braderax and Seale.) Because plaintiff has adduced evidence from which it may be inferred that defendants breached the terms of the Lands' End affiliate agreement, acted in bad faith, defrauded plaintiff and violated the Anticybersquatting Consumer Protection Act, defendants' motion will be denied with respect to these claims. However, defendants' motion will be granted with respect to plaintiff's claims under Wis. Stat. § 100.18 and 15 U.S.C. § 1125(a) because plaintiff has not produced evidence from which it may be inferred that defendants engaged in false advertising.

Before turning to the undisputed facts, I note that plaintiff alleges repeatedly in its brief and proposed findings of fact that defendants have destroyed evidence relevant to this case and have failed to disclose discoverable documents. Plaintiff invites the court to view defendants' alleged discovery errors as proof of defendants' bad faith. In the pretrial order, plaintiff was advised that this court "requires all parties to a discovery dispute to attempt to resolve it quickly and in good faith. . . . This court also expects the parties to file discovery motions promptly if self-help fails." Dkt. # 60, at 5. If plaintiff believed that defendants were not forthcoming in producing discoverable documents, its remedy was to file a timely discovery motion. It did not do so. A motion for summary judgment does not invite the court to re-solve discovery disputes, and I will decline plaintiff's invitation to do so in this case. Because it is not clear to what extent, if at all, defendants failed to provide plaintiff with discoverable evidence to which it was entitled, I will disregard plaintiff's discovery-related arguments in ruling on defendants' motion for summary judgment.

From the parties' proposed findings of fact, I find the following to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Lands' End, Inc. is a Delaware corporation with its principal place of business in Dodgeville, Wisconsin. Plaintiff is a direct marketer of apparel and home goods.

Defendant Thinkspin, Inc. is a Nevada corporation. Defendant Thinkspin operates www.savingsfinder.com, a popular Internet comparison shopping portal.

Defendant Braderax, Inc. is a Delaware corporation. Defendant Braderax operates www.poshshops.com.

Defendant Michael Seale operates www.shopperseguide.com.

### B. *Lands' End Affiliate Program*

The mark "Lands' End" has been in use since 1964, and is the subject of numerous United States trademark registrations, including U.S. Reg. No. 1263612. Since 1995, plaintiff's sales have exceed $1 billion annually. Plaintiff has invested hundreds of millions of dollars in advertising and marketing, and plaintiff's products have enjoyed a wide acceptance in the marketplace. A substantial amount of plaintiff's resources have been devoted to the development and maintenance of a website, www.landsend.com, through which customers may purchase plaintiff's goods.

To increase the number of internet users who visit its website, plaintiff operates an affiliate program that allows owners of approved websites to link to plaintiff's website. When an internet user clicks on a link on an affiliate's website, connects to www.landsend.com and makes a purchase from plaintiff, the affiliate earns a 5% commission on the purchase. The Lands' End affiliate program is operated and administered by the LinkShare Affiliate Network, which provides tracking technology and administers the payment of referral fees from plaintiff to its affiliates.

Defendants were Lands' End affiliates. To become affiliates, defendants clicked a link on plaintiff's website that took them to LinkShare's website. Once there, defendants completed applications and electronically "signed" a contract with LinkShare that set forth the general conditions for participating in any of LinkShare's affiliate programs. (LinkShare administers affiliate programs for merchants in addition to plaintiff.) The LinkShare agreement contained the following provision:

> Merchants' Terms and Conditions. In addition to and without limiting Your obligations under this Agreement, the terms and conditions of the Network Merchant's engagement govern Your performance of such engagement including Your use of the associated qualifying links, the tracked activities sought, the compensation that might become payable, and any limitations or restrictions that may apply to Your promotion of such Network Merchant or its qualifying links. LinkShare has no liability or responsibility to review, endorse, police or enforce any such engagements.

Dkt. # 77, Exh. A, at § 4.4. In addition to accepting the terms of the LinkShare agreement, defendants accepted the terms of plaintiff's affiliate agreement, which "contain[ed] the complete terms and conditions that appl[ied] to [defendants'] partic-

ipation as ... affiliate[s] in the Affiliate Network of Lands' End, Inc." Dkt. # 77, Exh. B, at 1. The affiliate agreement described the process for becoming an affiliate in this way:

> You may submit a completed Program application through the Linkshare Network to begin the enrollment process. We will evaluate your application and promptly notify you of your acceptance or rejection. We may reject your application if, in our sole discretion, we determine for any reason that your site is unsuitable for the Program, this includes but is not limited to, the inability to direct a reasonable amount of traffic by way of sales volume, clicks, and page views to our site. Unsuitable sites include, without limitation, those that contain illegal, offensive, infringing or objectionable content.

*Id.* Under the terms of the affiliate agreement, when a "customer ... follow[ed] a special link (in the format specified by Lands' End, Inc.) from [the affiliate's] site to the www.landsend.com site" and made a purchase there, the affiliate would be paid a "referral fee." *Id.* at 2. The affiliate agreement required affiliates to use "links ... provided [by] Lands' End's network servers or by other means selected by [Lands' End]." *Id.* at 1. If affiliates wished to use "other serving mechanisms, third party or otherwise," they were required to obtain plaintiff's authorization.

As part of the application process, defendants were required to disclose information about the websites they proposed to link to plaintiff's website. In the affiliate registration information, defendant Thinkspin represented that www. savingsfinder.com attracted "over 500,000" unique monthly visitors, defendant Braderax represented that www.poshshops.com attracted "50,000–500,000" unique monthly visitors and defendant Seale represented

that www.shopperseguide.com attracted "500–5,000" unique monthly visitors. Defendants were approved as Lands' End affiliates based on information they provided about the websites www.savingsfinder.com, www.poshshops.com, and www.shopperseguide.com. Defendants did not disclose their ownership or interest in www.lnadsend.com, www.klandsend.com, www.landsende.com, www.landdend.com, www.landswnd.com, www.landrnd.com, www.landsene.com, www.landsenc.com, www.landsennd.com, www.landse.com, www.landind.com, www.landswend.com or www.landwend.com.

### C. Defendants' Alleged Typosquatting Scheme

At all times relevant to this lawsuit, defendant Thinkspin owned the domain names www.lnadsend.com, www.klandsend.com, www.landsende.com, www.landdend.com, www.landswnd.com, www.landrnd.com, www.landsene.com, www.landsenc.com, www.landsennd.com, www.landse.com and www.landind.com. At all times relevant to this lawsuit, defendant Braderax owned the domain name www.landswend.com. At all times relevant to this lawsuit, defendant Seale owned the domain name www.landwend.com. Defendants no longer own or operate these websites.

During the time defendants owned the domain names listed above, the following actions would take place when an Internet user tried to access the Lands' End website but accidentally typed the name of one of defendants' websites into his web browser. First, the user would be directed to an "invisible" HTML file containing "redirection" instruction. The instruction would redirect the user's web browser to a specific Uniform Resource Locator (URL) on LinkShare's server that was associated with a particular affiliated website. Each Lands' End affiliate website had a unique identification number embedded in its URL for referrals to www.landsend.com. Computers operated by LinkShare and by Lands' End would "recognize" the identification number embedded in each URL and credit the "referring" affiliate website for purchases made by customers who accessed plaintiff's website using the encoded URL. Lands' End and LinkShare tracked referrals and paid commissions by reference to the identification number found in each affiliate's URL.

For example, if a user accidentally typed www.landenc.com into a web browser, the browser would appear to take the user immediately to the Lands' End website. In fact, however, the web browser would link the user "invisibly" to a URL associated with defendant Thinkspin's authorized affiliate website, www.savingsfinder.com. Although it would appear to the user as though he had accessed the Lands' End website directly, it would appear to Lands' End and LinkShare as though the user had accessed the website indirectly through a link on savingsfinder.com. Consequently, defendant Thinkspin would receive a 5% commission on any Lands' End purchases made by the user.

This process occurred only when a user mistyped the www.landsend.com address for the first time. If the user mistyped the Lands' End domain name at any later time, a phony error message would be displayed on the browser, stating that the Lands' End site was "unavailable and may be experiencing technical difficulties." The method defendants employed to redirect users to plaintiff's website made it difficult for unsophisticated users to realize that they were being rerouted to the Lands' End website through the URLs associated with defendants' LinkShare affiliate sites.

Eventually, Lands' End "detected unusual referral patterns and payments" made to defendants. At that time, they

investigated the matter and discovered that many of defendants' referrals had originated from typosquatting domain names. By that time, plaintiff had made $190,000 in sales to customers directed to www.landsend.com through defendants' websites. On those sales, defendant Thinkspin received $6,698 in commissions, defendant Braderax received $500 and defendant Seale received $26.

## OPINION

### A. *Anticybersquatting Consumer Protection Act*

The Anticybersquatting Consumer Protection Act was designed "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as cybersquatting." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 624 (4th Cir.2003) (citing S.Rep. No. 106–140, at 4 (1999)). In relevant part, the Act provides:

(1) (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d). To succeed on its claim under the Act, plaintiff must prove that (1) "Lands' End" is a distinctive or famous mark entitled to protection; (2) defendants' domain names are "identical or confusingly similar to" plaintiff's mark; and (3) defendants registered the domain names with the bad faith intent to profit from them. 15 U.S.C. § 1125(d)(1)(A); *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir.2001); *Sporty's Farm L.L.C. v. Sportsman's Market Inc.*, 202 F.3d 489, 497–499 (2d Cir.2000).

Disposing of the first two elements of plaintiff's claim is a simple task. Defendants concede that "Lands' End" is the registered trademark of a well-established company. Moreover, there is no question that the domain names registered by defendants are "confusingly similar to" plaintiff's domain name, in each case deviating from plaintiff's domain name by a single character. The real question in this case is whether plaintiff can prove that defendants registered the domain names with a bad faith intent to profit from the Lands' End mark.

Defendants contend that they did not act with bad faith because their typosquatting scheme directed traffic *to* plaintiff's website, rather than away from it. Plaintiff sees the matter differently and argues that defendants "hijacked Lands' End's own customers, sold them back to Lands' End, and collected a ransom for doing so." Dkt. # 83, at 19. Although "this is not the typical cybersquatting situation where a

person registers a famous mark or name and then attempts to extort profits from the owner of the mark by selling the domain name," *Virtual Works, Inc., v. Volkswagen of America, Inc.*, 238 F.3d 264 (4th Cir.2001), it is nevertheless a case in which defendants profited from their ownership of a domain name based on plaintiff's famous mark. The fact that defendants' conduct was not cybersquatting in its most "classic" form does not mean that it was not prohibited by the Anticybersquatting Consumer Protection Act.

"The key to a cybersquatting claim ... is bad faith intent to profit." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 680–681 (9th Cir.2005). How that profit is acquired matters less than the underlying bad faith. Although defendants contend that they provided a service to plaintiff, it is noteworthy that they took active steps to conceal their typosquatting scheme from plaintiff, and failed to disclose their "look alike" domain names to plaintiff when applying to become affiliates.

When determining whether a defendant acted in bad faith, courts are to consider a number of factors, including the nine factors set forth in § 1125(d)(1)(B)(I). These are:

(1) the trademark or other intellectual property rights of the person, if any, in the domain name;

(2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(3) the person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services;

(4) the person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name;

(5) the person's intent to divert consumers from the mark owner's online loca-

tion to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(7) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(I).

Defendants' conduct satisfies a number of these factors. Defendants have never used their infringing domain names as trademarks or service marks; thus, they had no intellectual property rights in them. The domain names did not contain any variation of defendants' names or of any

name closely related to the defendants. Defendants have never used the infringing domain names in connection with the *bona fide* offering of goods or services; they have used them only to obtain commissions from the sale of plaintiff's products by surreptitiously redirecting users to plaintiff's website. Defendants did not use the domain names for a non-commercial or "fair use" purpose.

If defendants are to prevail on their motion for summary judgment, it must be clear from the undisputed facts that they acted in good faith. Plaintiff has adduced substantial evidence from which it might be inferred that defendants exploited plaintiff's mark for their own commercial gain by using the typosquatting domain names to obtain 5% commissions on sales for which plaintiff would otherwise have received 100% profit. Because a factfinder could reasonably infer that defendants acted in bad faith, defendants' motion will be denied with respect to plaintiff's claim under the Anticybersquatting Consumer Protection Act.

### B. *False Advertising Claims*

#### 1. *Lanham Act*

The Lanham Act, 15 U.S.C. § 1125(a), proscribes the false description of goods and their origins. To prove a claim under the Act, plaintiff must show that defendants "(1) made a false or misleading statement, (2) that deceived or was likely to deceive a substantial segment of the audience to whom defendants advertised, (3) on a subject material to the consumer's decision to purchase the advertised goods, (4) touting goods entering interstate commerce, (5) and that resulted in actual or probable injury to plaintiff." *Grove Fresh Distributors, Inc. v. New England Apple Prods. Co.*, 969 F.2d 552, 557 (7th Cir.1992); *First Health Group Corp. v. United Payors & United Providers, Inc.*, 95 F.Supp.2d 845, 847 (N.D.Ill. 2000). Plaintiff's Lanham Act claim fails

for obvious reasons: defendants made no statements to the consumers who accidentally accessed their domain names and they sold no goods to plaintiff. Furthermore, it is difficult to see how defendants' actions could be construed as "advertising" in any sense of the word. Although defendants profited from their typosquatting scheme, they did so by *not* publicizing their venture. (After all, when the project was discovered, defendants were suspended from the affiliate program immediately and earned no further commissions.) It may be that defendants violated the law; however, they did not violate the Lanham Act. Consequently, defendants' motion for summary judgment will be granted with respect to plaintiff's claim that defendants' typosquatting scheme violated 15 U.S.C. § 1125(a).

#### 2. *Wis. Stat. § 100.18*

To prove a false advertising claim under Wis. Stat. § 100.18, plaintiff must show that (1) defendants made advertisements, announcements, statements or representations to the public relating to the purchase of merchandise; (2) the advertisements, announcements, statements or representations were untrue, deceptive or misleading; and (3) plaintiff sustained a pecuniary loss because of the advertisements, announcements, statements or representations. *Tietsworth v. Harley–Davidson, Inc.*, 2004 WI 32, ¶ 39, 270 Wis.2d 146, 677 N.W.2d 233.

Like plaintiff's Lanham Act claim, this false advertising claim fails because plaintiff cannot show that defendants made any "advertisements, announcements, statements or representations to the public relating to the purchase of merchandise." In its brief, plaintiff contends that defendants misled it in two ways. First, plaintiff asserts that defendants violated § 100.18 by misleading it about the source

of defendants' referrals. Implicit in this argument is the contention that plaintiff is a member of the public and that defendants' representations to it constituted false advertising. That logic blurs the essential distinction between defendants' actions with respect to plaintiff and defendants' actions with respect to end users. It was plaintiff's customers, not plaintiff, who purchased merchandise through defendants' typosquatting scheme. These customers were not deceived into purchasing goods they did not wish to purchase and were not subjected to any misrepresentations about the goods they ultimately purchased. They obtained exactly what they sought: Lands' End merchandise from the Lands' End website. Therefore, these users were not subject to any false representations from defendants and were not injured by defendants' conduct.

Plaintiff itself may have been subject to misrepresentations regarding the source of the customers directed to them through defendants' typosquatting scheme; however, such misrepresentations cannot be characterized as statements made "to the public relating to the purchase of merchandise." Wis. Stat. § 100.18. The purpose of § 100.18 is "to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product" to a consumer. *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2006 WI App 148, ¶ 19, 720 N.W.2d 507 (citing *State v. Automatic Merchandisers of America, Inc.*, 64 Wis.2d 659, 663, 221 N.W.2d 683, 686 (1974)); *Peterson v. Cornerstone Property Development*, 2006 WI App 132, ¶ 26, 720 N.W.2d 716. It is not designed to protect product manufacturers from paying commissions on the sale of their own products, however unearned those commissions may be. Because plaintiff has adduced no evidence from which it might be inferred that defendants violated Wis. Stat. § 100. 18, defendants' motion will be granted with

respect to plaintiff's false advertising claim.

### C. *Breach of Contract*

■ Plaintiff contends that defendants breached the terms of the Lands' End affiliate agreement expressly and by breaching the duty of good faith and fair dealing implicit in every contract. *See, e.g., M & I Marshall & Ilsley Bank v. Schlueter*, 2002 WI App 313, ¶ 15, 258 Wis.2d 865, 655 N.W.2d 521 ("Under Wisconsin law, an implied duty of good faith and fair dealing between the parties attaches to every contract."). Although defendants were required to enter into two contracts in order to become Lands' End affiliates (the "Affiliate Membership Agreement" with LinkShare and the "Lands' End Operating Agreement for Affiliate Network" with plaintiff), the only contract at issue is the Lands' End affiliate agreement.

Plaintiff asserts that the two contracts should be read together because they were electronically signed at the same time and because the contracts refer to one another. Although each contract makes reference to the other, neither incorporates the terms of the other. The LinkShare contract and the Lands' End affiliate contract are distinct in several ways. First, they are governed by different law. *Compare* dkt. # 77, Exh. A, at § 20.5 (applying New York law to LinkShare agreement) *with* dkt. # 77, Exh. B, at § 17 (applying Wisconsin law to Lands' End affiliate agreement). Second, § 4.4 of the LinkShare contract states expressly:

In addition to and without limiting Your obligations under this Agreement, the terms and conditions of the Network Merchant's engagement govern Your performance of such engagement including Your use of the associated qualifying links, the tracked activities sought, the compensation that might become pay-

able, and any limitations or restrictions that may apply to Your promotion of such Network Merchant or its qualifying links. LinkShare has no liability or responsibility to review, endorse, police or enforce any such engagements.

Inexplicably, defendants contend that § 4.4 incorporates the provisions of the LinkShare agreement into the terms of the Lands' End affiliate agreement. Plainly, it does not. Section 4.4 makes clear that the LinkShare agreement does not abrogate the terms of any particular Merchant's agreement with an affiliate. Instead, it imposes *additional* obligations on affiliates separate from those created by any particular merchant's agreement. Affiliates are required to abide by the LinkShare agreement *and* by any affiliate agreements entered with individual merchants.

In this case, the Lands' End operating agreement is the only contract under which plaintiff is entitled to bring suit against defendants because it is the only contract to which both plaintiff and defendants are party. *State ex rel. Journal/Sentinel, Inc. v. Pleva,* 155 Wis.2d 704, 709, 456 N.W.2d 359, 361–362 (1990) ("Generally, a contract between two persons is not binding on persons who are not in privity to it."). Furthermore, because no provision of the Lands' End affiliate agreement adopts the provisions of the LinkShare agreement, the Lands' End affiliate agreement must be read independently. Therefore, defendants' assertion that their actions were not prohibited by the terms of the LinkShare agreement is irrelevant to plaintiff's breach of contract claim. The only contract at issue is the Lands' End affiliate agreement.

The primary goal of contract construction is to determine and give effect to the parties' intention at the time the contract was made. *Farm Credit Services v. Wysocki,* 2001 WI 51, ¶ 12, 243 Wis.2d 305, 627 N.W.2d 444. When the terms of the contract are plain and unambiguous, the court must construe the contract according to its plain meaning. *Id.* When a contract's provisions are ambiguous, and only when they are ambiguous, courts will construe any ambiguities against the drafter of the contract. *Walters v. National Properties, LLC,* 282 Wis.2d 176, 185, 699 N.W.2d 71, 75 (2005). A contract is ambiguous if it is susceptible to more than one reasonable construction. *Kohler Co. v. Wixen,* 204 Wis.2d 327, 335, 555 N.W.2d 640 (Ct.App.1996).

It is undisputed that under the plain terms of the Lands' End affiliate agreement, defendants were required to obtain pre-approval for their affiliated websites and to connect users to plaintiff's website using only links "provided [by] Lands' End's network servers or ... other means selected by [Lands' End]." Before linking to the Lands' End site by "other serving mechanisms, third party or otherwise," affiliates were required to obtain plaintiff's approval.

Defendants contend that they did not violate the express terms of the affiliate agreement when they re-routed visitors to their typosquatting sites through their legitimate affiliate websites. Plaintiff disagrees, and asserts that although defendants made it appear as though visitors had accessed the Lands' End site through defendants' affiliate websites, the typosquatting visitors were taken to plaintiff's website without first accessing the approved affiliate sites. If defendants linked visitors from their typosquatting sites to plaintiff's website by "serving mechanisms" other than those selected or provided by Lands' End, they breached the unambiguous terms of the agreement. However, if they rerouted visitors from the typosquatting websites through their legitimate affiliate sites to plaintiff's site using mechanisms selected or provided by

Lands' End, it is not clear that they violated the contract's express terms. Because the parties dispute key facts relevant to plaintiff's breach of contract claim, defendants' motion for summary judgment will be denied.

One other point bears mentioning with respect to plaintiff's breach of contract claim. In their briefs, defendants assert that a party to a contract violates the implied duty of good faith and fair dealing only when it violates an express provision of the contract. Defendants are mistaken. Under Wisconsin law,

> [e]very contract implies good faith and fair dealing between the parties to it. Thus, compliance in form, not in substance breaches that covenant of good faith. Although the covenant of good faith and fair dealing that is implied in all contracts cannot override a contract's express terms, obligations under those terms must be performed subject to that implied covenant, and a party may be liable for breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled.

*Wisconsin Natural Gas Co. v. Gabe's Const. Co., Inc.*, 220 Wis.2d 14, 21–22, 582 N.W.2d 118, 121 (Ct.App.1998) (internal citations omitted). Therefore, even if defendants did not violate the letter of the Lands' End affiliate agreement, they breached the agreement if they knowingly violated the spirit of the contract. Because relevant details of defendants' typo-squatting scheme remain in dispute, defendants are not entitled to summary judgment on plaintiff's claim that they breached the duty of good faith and fair dealing inherent in the affiliate agreement.

### D. *Fraud*

■ Under Wisconsin law, a claim for fraud (more commonly known as intentional or fraudulent misrepresentation) has five elements: "(1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment." *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis.2d 555, 699 N.W.2d 205. An intentional misrepresentation claim may arise from a statement of a material fact that is untrue or from a failure to disclose a material fact if a person has a duty to disclose the withheld information. *Id.*, ¶ 13, 699 N.W.2d 205.

■ Plaintiff contends that defendants defrauded it in two ways. First, plaintiff contends that defendants falsified information on their affiliate applications by misrepresenting the volume of traffic to their "legitimate" non-typo squatting websites. By conceding that they had no way to measure the number of users to their Internet sites, defendants have all but confessed that the numbers they provided on their application were falsified. However, the falsification is not actionable because plaintiff failed to plead it in the amended complaint.

Like the Federal Rules of Civil Procedure, Wisconsin law requires that all allegations of fraud be pleaded with particularity. Wis. Stat. § 802.03(2); *Friends of Kenwood v. Green*, 2000 WI App 217, ¶ 14, 239 Wis.2d 78, 619 N.W.2d 271. In the amended complaint, plaintiff alleged:

> The Defendants have knowingly made false representations of fact that the internet sales by Lands' End were the result of referrals from the Defendants' affiliate websites. The Defendants have made such false representations of fact intending that Lands' End be deceived,

and that Lands' End acted on those false representations to its detriment. Cpt., dkt. # 62, at 7–8. Plaintiff made no mention of any falsifications by defendants in their applications for the Lands' End affiliate program. Consequently, plaintiff may not rely on such falsifications at this stage of the proceedings as a basis for its intentional misrepresentation claim.

However, plaintiff's second argument relates to the facts pleaded in the complaint. Plaintiff asserts that defendants made "false representations" by (1) not disclosing the source of its web referrals and (2) using programming code to disguise the source of the referrals, making them appear to come from defendants' approved affiliate websites.

Under Wisconsin law, material omissions may constitute factual misrepresentations only when a party is under a duty to disclose the information that has been withheld. A party to a business transaction has a duty to disclose a fact when

the fact is material to the transaction; the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti Enterprises, Inc.,* 2005 WI 111, ¶ 20, 283 Wis.2d 555, 699 N.W.2d 205. In this case, plaintiff has adduced evidence showing that defendants went to great lengths to conceal their typosquatting scheme—steps that would have been unnecessary had defendants believed their business practices to be legitimate and which plaintiff had no reason to suspect. Under these circumstances, plaintiff has produced sufficient evidence from which it could be found that defendants concealed relevant facts they were obligated to disclose to plaintiff.

In addition to alleging that defendants concealed information, plaintiff alleges that defendants actively misrepresented the source of their referrals through the use of obfuscating codes that disguised the origin of users rerouted from defendants typosquatting sites to plaintiff's website. Wisconsin courts have long held that

[m]isrepresentation can be conveyed by one's actions as well as by spoken words. . . . It is not necessary for a person to make oral misrepresentation of fact in order to be guilty of fraudulent conduct—such representations may be made by the acts or conduct of the party . . . . Any conduct capable of being turned into a statement of fact is a representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts.

*Lundin v. Shimanski,* 124 Wis.2d 175, 186, 368 N.W.2d 676, 682 (1985) (citing *Scandrett v. Greenhouse,* 244 Wis. 108, 113, 11 N.W.2d 510 (1943)); *see also Goerke v. Vojvodich,* 67 Wis.2d 102, 106–07, 226 N.W.2d 211, 214 (1975).

It is undisputed that defendants programmed their domain names to connect users to the Lands' End website via the LinkShare website in a manner that made the traffic from www.lnadsend.com, www.klandsend.com, www.landsende.com, www.landdend.com, www.landswnd.com, www.landrnd.com, www.landsene.com, www.landsenc.com, www.landsennd.com, www.landse.com, www.landind.com, www.landswend.com and www.landwend.com appear to plaintiff to have come from www.savingsfinder.com, www.poshshops.com and www.shopperseguide.com, defendants' approved affiliate websites. Although defendants did not make false verbal statements, there is no reason to suppose (as

defendants apparently do) that the manner in which defendants used programming code to disguise the source of their business was not a "false representation" actionable under the common law. From the undisputed facts, a fact finder could reasonably infer that defendants intentionally misrepresented the source of their referrals and thereby defrauded plaintiff. Consequently, defendants' motion for summary judgment will be denied with respect to plaintiff's fraud claim.

### C. Damages

■ Throughout their summary judgment briefs, defendants assert repeatedly that plaintiff benefited from defendants' actions and therefore cannot prove any damages resulting from plaintiff's actions. Defendants take the position that they helped plaintiff make money by referring "lost" customers back to plaintiff's website. Defendants assert that, without their redirection, many of the customers who mistyped the landsend.com website address would have "given up" or turned to competitor's websites for their goods. This line of reasoning is specious, at best.

It is undisputed that, had defendants not operated their typosquatting websites, customers would have seen an error message in their Web browsers displaying the mistyped Web address www.lnadsend.com, www.klandsend.com, www.landsende.com, www.landdend.com, www.landswnd.com, www.landrnd.com, www.landsene.com, www.landsenc.com, www.landsennd.com, www.landse.com, www.landind.com, www.landswend.com or www.landwend.com. It is not unreasonable to assume that most, if not all, customers would have noticed their typographical error and would have retyped the correct address for plaintiff's website. If customers had done so, plaintiff would have reaped 100% of the profit of the sales made to these customers, rather than the 95% profit made when customers made purchases through defendants'

typo squatting scheme. Although plaintiff's damages may have been minimal with respect to the defendants remaining in this lawsuit, it would be incorrect to say they were nonexistent as a matter of law. At trial, plaintiff will be free to prove that they lost money they would otherwise have earned had defendants not operated their typosquatting domain names in the manner they did.

### ORDER

IT IS ORDERED that the motion for summary judgment of defendants ThinkSpin, Inc., Braderax, Inc. and Michael Seale is

1. DENIED with respect to plaintiff's claim that defendants violated the Anticybersquatting Consumer Protection Act, breached the terms of their affiliate agreement with plaintiff and defrauded plaintiff; and

2. GRANTED with respect to plaintiff's claim that defendants violated the Lanham Act and Wis. Stat. § 100.18.